[Civ. No. 3870. Fifth Dist. Mar. 28, 1979.]

In re DAVID B., a Minor.
KERN COUNTY WELFARE DEPARTMENT,
Petitioner and Respondent, v.
DELORES B., Objector and Appellant.

## COUNSEL

David H. Fielding, under appointment by the Court of Appeal, for Objector and Appellant.

George Wright Quick, under appointment by the Court of Appeal, for Minor.

Ralph B. Jordan, County Counsel, and Carol D. Brown, Deputy County Counsel, for Petitioner and Respondent.

## Opinion

### FRANSON, Acting P. J.—

#### Statement of the Case

This is an appeal from a judgment entered pursuant to Civil Code section 232, subdivision (a)(6), declaring the minor David B. forever free from the custody and control of his only known parent, appellant Delores B., and referring David for adoption placement. The basis for the order severing the parental relationship was appellant's inability to care for her son, due to her mental illness.

Dependency proceedings were initiated by the Kern County Welfare Department on December 23, 1976, just a few days after David was born to appellant. A petition was filed in the superior court alleging that David came within the provisions of former Welfare and Institutions Code section 600, subdivision (a) (now § 300, subd. (a)), because he had no parent capable of or willing to exercise parental care and control. At the jurisdictional hearing on January 3, 1977, the court found the allegations of the amended petition to be true. A dispositional hearing was held on January 17, 1977, at which time the court considered a report prepared by social worker Suzanne Dawson.

The juvenile court concluded that appellant was incapable of providing, or had failed to provide proper maintenance, training, and education for David. The court further found that it would be detrimental to the minor to be returned to his mother's custody. The juvenile court accordingly ordered that David should remain in shelter care pending placement. Although appellant received notice of her right to appeal from that order, no appeal was taken. Proceedings to have David declared forever free from the parental custody and control of appellant were commenced shortly thereafter. On January 25, 1977, respondent filed a petition in the superior court alleging that David was a minor described by Civil Code section 232, subdivision (a)(6).[1] The petition

---

[1] At the time the petition was filed, section 232 provided in pertinent part: "(a) An action may be brought for the purpose of having any person under the age of 18 years declared free from the custody and control of either or both of his parents when such person comes within any of the following descriptions:

"...  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"(6) Whose parent or parents are, *and will remain* incapable of supporting or controlling the child in a proper manner because of mental deficiency or mental illness, if there is testimony to this effect from two physicians [with specified qualifications] . . . ." (Italics added.)

sought to have David placed in the custody of the Kern County Welfare Adoptions Unit for the purpose of adoption planning and placement.

Pursuant to section 232, the court ordered that a citation issue to appellant, directing her to appear at a hearing on the petition. Prior to the hearing, psychological reports on appellant were filed by court-appointed psychiatrists, Dr. Phillip Kelly, Jr., and Dr. Richard E. Burdick. A probation officer's report was also filed.

After hearing the testimony and reviewing the reports of the psychiatrists, the probation officer and the social worker, the court found inter alia that:

"2. Because of the mental deficiency and mental illness of respondent, natural mother, said mother is and will remain incapable of supporting or controlling said minor in a proper manner.

"3. Two Board certified psychiatrists testified the natural mother is and will remain incapable of supporting and controlling said minor.

"4. It would be detrimental to the child if he were returned to the natural mother.

"5. It is in the best interest of the child if he is freed from the custody and control of the mother.

"6. No protective services offered by the County of Kern are appropriate for the welfare of the minor."

Additional findings of fact and conclusions of law were subsequently filed by the trial court. On December 21, 1977, judgment was entered freeing David B. forever from the parental custody and control of his mother appellant Delores B.

## THE EVIDENCE

David B. was born to appellant at Kern Medical Center in Bakersfield on December 17, 1976. The child's father is unknown.[2] Four days after David was born, he was placed in protective custody because members of the hospital staff concluded that it would be dangerous to place the newborn infant in his mother's care at home.

---

[2] Parental rights of anyone claiming to be the father were terminated by a separate proceeding.

Appellant's history prior to giving birth to David is recounted in a social worker's report which was prepared for the juvenile court dispositional hearing, and admitted into evidence at the section 232 hearing. The report depicts a tragic history of continuing mental illness. It states that appellant was a victim of parental abuse by her emotionally disturbed mother. In 1966, appellant, who was then 16 years old, was admitted to a Pennsylvania hospital due to her mental illness, which was then diagnosed as a form of schizophrenia. She remained hospitalized for two years. Appellant then lived and worked in Pennsylvania for two years until she became pregnant with twins. She then traveled by bus to San Diego, California, to look for the alleged father of her unborn twins. Appellant believed that the father was in California, because she had reportedly received messages from extra-terrestrial beings. In San Diego, appellant was investigated by various social agencies, because of her doctor's concern for her ability to care for the twins. These investigations resulted in the children being removed from appellant's custody: the twins have since been freed for adoption.

In 1972, appellant traveled to Bakersfield, again searching for the twins' alleged father. The Kern County Welfare Department became involved with appellant in 1973, when the department attempted to help her qualify for aid to the totally disabled on the basis of her past emotional instability. Appellant underwent a psychological evaluation to qualify for the financial aid and was again diagnosed as schizophrenic. She refused any ongoing therapy at that time. In November 1973, appellant was admitted to the mental ward of Kern Medical Center after exhibiting violence on neighbors. Shortly after her release, she was readmitted to the hospital because she failed to care for herself when sick with the flu. Appellant then spent about one and one-half years in a convalescent hospital, until she was transferred to a board and care facility. Representatives of the State Department of Health Continuing Care Services then became involved in providing services for appellant. When it was discovered that appellant was again pregnant, representatives of Continuing Care Services encouraged her to seek prenatal care. Appellant was uncooperative and planned to have her baby at home without assistance. Although appellant had gonorrhea during her pregnancy, she failed to see a doctor for followup care because she was bleeding and feared that something might be wrong with the baby. In order to assure a safe hospital birth for the baby, representatives of Continuing Care Services petitioned to have appellant admitted to the mental ward of Kern Medical Center. After the baby David was born, appellant was released from the hospital and David was taken into protective custody.

David has never lived with his mother, thus there is no evidence that she has ever physically abused him. However, appellant does have a history of violent behavior. She reportedly "slaps her cats around" when she is angry. Two dead cats, apparently strangled, were found in the closet of appellant's apartment when she moved out. In 1976, appellant was found guilty of shooting a rifle into an inhabited dwelling; she had fired the weapon because she was angry with neighbors. There were also several other reported incidents when appellant had threatened neighbors with bodily harm.

The two court-appointed physicians also filed reports and testified at the section 232 hearing. It was stipulated that both doctors were qualified under section 232, subdivision (a)(6). Dr. Burdick's report details appellant's impulsive behavior and nomadic tendencies. The report notes that after David was taken from appellant, she hitchhiked around the east coast looking for relatives. While in Washington D.C., she was arrested for attempting to climb the White House fence. The doctor diagnosed appellant as paranoid schizophrenic and opined that this illness made her incapable of supporting and controlling David. Dr. Burdick testified that appellant's illness might cause her to be neglectful of David's safety; she might also abandon the child. Burdick thought it was possible that appellant could inflict physical harm on the child in acute stages of her illness. Burdick predicted that if appellant were reunited with David, it would not be a lasting, stable mother-child relationship, because when appellant's problems flared up, there would be no backup support from family and friends. Dr. Burdick stated that he could not foresee a time when appellant would be stable enough so that it would be in the child's best interest to be in her care. The doctor also gave his opinion that no drug therapy or social agencies could successfully assist appellant in providing the stable environment needed to raise the child, particularly because appellant's nomadic tendencies would interfere with attempts at treatment and efforts made by the social agencies. Dr. Burdick concluded that appellant would remain incapable of controlling and supporting her child in the future.

The other appointed psychiatrist, Dr. Kelly, also diagnosed appellant as schizophrenic and concluded that the illness renders her incapable of caring for her son. Dr. Kelly testified that appellant's thought disorder could cause her to act violently. Kelly opined that the child would be in physical danger if he were returned to appellant in her present state. In discussing the prognosis for appellant's illness, Kelly stated that appellant's illness would be lifelong, but he thought the prognosis was fairly

good that appellant would be able to control her child if she received two years of continuous treatment. However, Dr. Kelly noted that appellant would probably not voluntarily submit to such treatment and would require 24-hour restraint, at least initially. Kelly stated that if appellant did not take her medication, she would be unable to care for her child.

In addition to the above medical opinions, there was testimony from social workers regarding the availability of suitable social services to assist appellant in caring for her child. Ms. Daphne Potter, an employee of the Kern County Welfare Department, Adoptive Services, testified that prior to referring David to adoptive services, a determination had been made that child protective services would be inappropriate. The supervisor of child protective services, Mr. Steven Broemer, stated that his agency provides services to forestall the necessity of removing children from their parents by court action. However, Broemer stated that his agency had no jurisdiction to intervene once the courts became involved. Mr. Broemer stated that his review of the records concerning David convinced him that it would not have been feasible for his agency to intervene, even had it been requested to do so. Broemer stated that child protective services did not have the expertise or ability to deal with appellant's chronic problems. Mr. Broemer also testified that although he was familiar with other local agencies responsible for attempting to keep families together, he did not believe that any of those agencies offered services which would have enabled appellant to raise David in a normal parent-child relationship. He stated that he was unaware of any board and care situation where appellant could receive the necessary psychiatric treatment.

The final witness to testify at the hearing was appellant Delores B., who said that she wanted her son back. Appellant testified that she was not undergoing any medical treatment at that time and denied being schizophrenic and having delusions.[3] Several times during the hearing, when other witnesses were testifying, appellant's behavior became uncontrolled; there were several spontaneous outbursts of threatening and abusive language.

To summarize, there was no evidence that appellant had ever abused David because he had never lived with her; however, there was evidence of appellant's violent behavior toward her cats and her neighbors. There was also evidence that appellant had neglected to obtain proper prenatal care and that her mental illness had resulted in an impulsive, nomadic

---

[3]Appellant was subsequently placed under conservatorship, and as of May 2, 1978, she resided at Patton State Hospital.

life style which was not conducive to getting needed medical attention or to raising a child. There was also evidence that there were no social agencies which could enable appellant to properly provide for her child in the foreseeable future.

## DISCUSSION

Appellant contends that Civil Code section 232, subdivision (a)(6) denies her substantive due process in violation of the 14th Amendment and California Constitution article I, section 7, subdivision (a), in that it authorizes a severing of the parental relationship without a showing of actual neglect or mistreatment of the child. Subsumed within the due process challenge is the question whether the court may sever the parental relationship without affording appellant a reasonable time for medical treatment to determine if she can be restored to that degree of mental health as to be capable of caring for her child. **(1)** For the reasons to be explained, we hold that the statute does not effect such a deprivation of due process provided two conditions are met by clear and convincing proof: (1) that the mental deficiency or illness is settled in that it will continue for an indefinite period of time in the future regardless of medical treatment available to the parent; and (2) that the immediate severance of the parental relationship is the least detrimental alternative available to protect the welfare of the child. Where these two conditions are met, the parental relationship may be severed constitutionally without proof of actual harm to the child and without further medical treatment of appellant.

Substantive due process prohibits governmental interference with a person's fundamental right to life, liberty or property by unreasonable or arbitrary legislation. (13 Cal.Jur.3d, Constitutional Law, § 364, pp. 676-677; Bice, *Standards of Judicial Review Under the Equal Protection and Due Process Clauses* (1977) 50 So.Cal.L.Rev. 689, 707.) A parent's interest in the care, custody and companionship of a child is a "liberty" to be ranked among "the most basic of civil rights." (*In re B.G.* (1974) 11 Cal.3d 679, 688-689 [114 Cal.Rptr. 444, 523 P.2d 244], citing *Stanley* v. *Illinois* (1972) 405 U.S. 645, 651 [31 L.Ed.2d 551, 558-559, 92 S.Ct. 1208], accord, *In re Susan M.* (1975) 53 Cal.App.3d 300, 310 [125 Cal.Rptr. 707]; *Lois R.* v. *Superior Court* (1971) 19 Cal.App.3d 895, 901 [97 Cal.Rptr. 158].) Hence, the parenting right may not be interfered with in the absence of a "compelling state interest." (See *Roe* v. *Wade* (1973) 410 U.S. 113, 155 [35 L.Ed.2d 147, 178, 93 S.Ct. 705].) This means that section 232, subdivision (a)(6) is subject to a strict standard of judicial review

under which the severance of the parental relationship can be upheld only if it is *necessary* to the legislative purpose of the statute—the welfare of the child (see *Roe* v. *Wade, supra,* 410 U.S. at p. 155 [35 L.Ed.2d at p. 178]; Stone, *Introduction: Due Progress of "Due Process"* (1974) 25 Hastings L.J. 785, 796). When fundamental rights are at stake, the legislative enactments must be narrowly drawn to express only the legitimate state interest (*Roe* v. *Wade, supra,* 410 U.S. at p. 155 [35 L.Ed.2d at p. 178]; *Griswold* v. *Connecticut* (1965) 381 U.S. 479, 485 [14 L.Ed.2d 510, 515-516, 85 S.Ct. 1678]).

Only in extreme cases may the parenting right be disturbed and then only when there is no reasonable alternative such as temporary foster home placement which will protect the child's interests pending restoration of the parent to that degree of mental health where he can properly care for the child. (See *In re Carmeleta B.* (1978) 21 Cal.3d 482, 489 [146 Cal.Rptr. 623, 579 P.2d 514]; *In re T.M.R.* (1974) 41 Cal.App.3d 694, 703 [116 Cal.Rptr. 292]; see also Kay & Phillips, *Poverty and the Law of Child Custody* (1966) 54 Cal.L.Rev. 717.) Our Supreme Court has emphasized the extreme gravity of the parenting right by focusing attention "not on the unfitness of the parent but the *detriment to the child.*" (See Civ. Code, § 4600; *In re B.G., supra,* 11 Cal.3d 679, 698.) *B.G.* permits custody to go to nonparents ". . . only upon a clear showing that such award is essential to avert harm to the child" (*id.,* at p. 699).

Mentally ill persons under section 232, subdivision (a)(6) have been defined as those persons " '(a) Who are of such mental condition that they are in need of supervision, treatment, care, or restraint' " or " '(b) Who are of such mental condition that they are dangerous to themselves or to the person or property of others . . . .' " (*In re Baby Boy T.* (1970) 9 Cal.App.3d 815, 820 [88 Cal.Rptr. 418], accord, *In re Eugene W.* (1972) 29 Cal.App.3d 623, 628, fn. 2 [105 Cal.Rptr. 736].) In using the terms "mental deficiency" and "mental illness" in Civil Code section 232, the Legislature intended to embody the concepts of mentally ill and mentally deficient persons then set forth in Welfare and Institutions Code sections 5590 and 5550. (*Ibid.;* see also *In re Carmeleta B., supra,* 21 Cal.3d at p. 490, fn. 7.) This restricted meaning of mental illness and mental deficiency was reaffirmed by our Supreme Court in *In re Carmeleta B., supra,* where the Kern County Counsel (as amicus curiae) had suggested a broader definition of the terms to facilitate the termination of the parental relationship where the parents were demonstrably incapable of providing proper care but were nevertheless not so incapable as to require " '. . . supervision, treatment . . . or restraint.' " The court wisely rejected such a suggestion because ". . . family rights, both the parent's

and the child's rights, should not be vulnerable to a too easy finding of mental illness." (*Id.*, at p. 491.)[4]

The statutory standard of inability to support or control the child in a "proper manner" because of mental deficiency or mental illness has been held to mean " 'such control as parents ordinarily exercise . . . [and implies] . . . the usual incidents of the exercise of control' over the child." (See *In re Heidi T.* (1978) 87 Cal.App.3d 864, 871, [151 Cal.Rptr. 263], quoting from *Marr* v. *Superior Court* (1952) 114 Cal.App.2d 527, 530 [250 P.2d 739].) The standard has been upheld against a constitutional challenge of vagueness (*In re Heidi T., supra,* 87 Cal.App.3d at p. 871).

Civil Code section 232, subdivision (a)(6) expressly requires that two certified physicians verify that the parent is *and will remain* incapable of supporting or controlling the child in a proper manner because of mental illness or deficiency. Furthermore, although subdivision (a)(6) is silent as to the degree of proof required to terminate the parental relation, it has been judicially declared that the proof must be by *clear and convincing evidence (id.,* at p. 870). It also has been judicially declared that custody can be given to a nonparent as against a parent only upon clear proof that it is necessary to avert harm to the child (*In re B.G., supra,* 11 Cal.3d at p. 699). Thus, the standard for determining the parent's mental illness or deficiency, the standard for determining the parent's inability to support or control the child, the requirement of a finding of probable harm to the child if placed in the parent's custody, and the high degree of proof required to satisfy all of the conditions precedent to terminating the parental right, are carefully circumscribed to protect the rights of both the parent and the child.

Appellant's argument that it is only when the parent has actually harmed the child that the state can sever the parental relationship was rejected in a recent Pennsylvania case. (*In re William L.* (1978) 477 Pa. 322 [383 A.2d 1228] cert.den. 439 U.S. 880 [58 L.Ed.2d 192, 99 S.Ct. 216].)

[1]The Supreme Court pointed out that when the mental illness or deficiency standard articulated in subdivision (a)(6) of section 232 prevents severance in those cases where the parents are incapable of providing proper care, the state may nonetheless protect the child from any significant harm by proceeding under subdivision (a)(7) which provides that a child may be freed from parental custody and control "[w]ho has been cared for in one or more foster homes . . . for two or more consecutive years, . . . [if] the court finds by clear and convincing evidence that return of the child to his parent[s] . . . would be detrimental to the child . . . ." The section balances the interests of the child in secure parenting with the conjoined interests of both parent and child in preserving the family bond. It also has the added advantage of permitting the parents a longer period, two years, in which to rehabilitate themselves to a position whereby they can properly fulfill their parental responsibility (*id.,* at pp. 491-492).

In that case, the Pennsylvania Supreme Court held that substantive due process was not violated by the severing of the parent-child relationship without a showing of actual harm to the child under a statute similar to the one applicable here (383 A.2d at pp. 1234-1237). The Pennsylvania high court noted that "the state ha[s] not only a right, but a duty to protect minor children" (383 A.2d at p. 1235, citing *Stanley* v. *Illinois, supra,* 405 U.S. at p. 649 [31 L.Ed.2d at p. 557]). The Pennsylvania court also stated that "[c]onstitutional restraint on state interference in family matters does not compel the courts to protect parental rights at the expense of ignoring the rights and needs of children" (383 A.2d at p. 1235). Discussing the conflicting rights of the parent and child in such cases, the court stated: "When, as here, a parent is incapable of meeting the child's essential needs, . . . the state may constitutionally intervene to protect the 'physical or mental well-being' of the child. In these circumstances, the interest of the parent in keeping the child conflicts with the interest of the child in its essential physical and emotional needs and the Legislature has constitutionally mandated that the interests of the weaker party, the child, should prevail. This legislative determination must be accorded great deference for 'when an issue involves policy choices as sensitive as those implicated by [the involuntary termination of parental rights], the appropriate forum for their resolution in a democracy is the legislature.' *Maher* v. *Roe,* 432 U.S. 464, 97 S.Ct. 2376, 2385-2386 . . . (1977)" (383 A.2d at p. 1236). The reasoning in the Pennsylvania decision is sound because the welfare of the child is the paramount concern. (See *In re Stanley F.* (1978) 86 Cal.App.3d 568, 575. [152 Cal.Rptr. 5]; *In re Heidi T., supra,* 87 Cal.App.3d 864, 873.)

Furthermore, by Civil Code section 232, subdivision (a)(6), the Legislature has determined that when the parent is unable, due to mental illness, to properly care for the child over an extended period of time, the child should be placed for adoption so that it may obtain a stable home, rather than remain in temporary foster care pending a possible return to the custody of the parent. The Legislature has stated the purpose behind section 232 proceedings when it added section 232.9 to the Civil Code. "It is the intention of the Legislature in enacting this act to extend adoption services for the benefit of children residing in foster homes at public expense by facilitating legal actions required for adoption *so that these children may be placed in adoptive homes where they will have the benefits of stability and security.*" (Stats. 1970, ch. 583, § 1, p. 1160, italics added; see *In re Eugene W., supra,* 29 Cal.App.3d 623, 628-629 holding that this governmental purpose was sufficiently compelling for former § 232, subd. (g) (now subd. (a)(6)) to withstand an equal protection challenge.) Under the statute, the state is acting to prevent the permanent psychological

harm which would result to the child if he is moved from one foster home to another until he obtains majority. (See Wald, *State Intervention on Behalf of "Neglected" Children: Standards for Removal of Children from Their Homes, Monitoring the Status of Children in Foster Care, and Termination of Parental Rights* (1976) 28 Stan.L.Rev. 625, 695.)

We conclude that the legislative determination that the state may permanently sever the parental relationship to free the child for adoption whenever it is established by clear and convincing proof that because of a mental illness or mental deficiency, the parents are and will remain incapable of providing the necessary support and control for the child is reasonable and consistent with substantive due process *provided* the trial court finds: (1) on the basis of the consistent opinions of two physicians that the parent's mental illness or deficiency is settled in that it will continue in the foreseeable future regardless of any medical treatment that would be available to the parent, and (2) that the immediate severance of the parental relationship is the *least detrimental alternative* available to protect the welfare of the child. In this regard, the judge must carefully explore all reasonable alternatives to severing the parent relationship such as child protective services and temporary foster home care pending efforts to rehabilitate the parent. These alternatives should be employed unless they would result in serious psychological harm to the child. However, if the court determines that available medical and social resources are inadequate to rehabilitate the parent to a level where he or she will be able to assume responsibility for the child, then it becomes inimical to the child's welfare to delay efforts to seek permanent adoptive placement. As stated in Wald, *State Intervention on Behalf of "Neglected" Children, supra,* 28 Stan.L.Rev. 625, the termination of the parental right should also be looked at from the child's viewpoint. "The consensus of expert opinion holds that it is most important to avoid multiple placements for children between six months and three years of age. Each additional placement may retard the development and may impair their ability to form lasting attachments." (*Id.,* at p. 695.) The avoidance of lasting psychological harm to the child is the compelling state interest behind prompt severance of the parental relationship. Once the court has determined that there are no reasonable alternatives, severance can be justified as necessary to achieve that compelling state interest.

Appellant next contends that there was insufficient evidence to support the finding that because of mental deficiency and mental illness, she is and "will remain" incapable of supporting or controlling her child in a

proper manner. She makes two arguments: First, there is insufficient evidence of her permanent inability to care for her child and, second, there are less drastic alternatives available which the trial court should have utilized and which would have avoided the necessity of severing the parental relationship.

In answering these contentions, we repeat the oft-quoted rule: "The power of any appellate court commences and terminates with a determination as to whether or not there is any substantial evidence, whether or not contradicted, which will support the conclusion of the trier of fact. All conflicts must be resolved in favor of respondent on appeal and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. Where there is more than one inference which can reasonably be deduced from the facts, the appellate court is without power to substitute its deductions for those of the trier of fact. All evidence favorable to respondent is assumed true and the unfavorable is discarded. If the evidence so viewed is sufficient as a matter of law, the judgment must be affirmed." (*In re Marcos S.* (1977) 73 Cal.App.3d 768, 781 [140 Cal.Rptr. 912]; see also *In re Heidi T., supra,* 87 Cal.App.3d 864, 872.)

It was stipulated that Doctors Kelly and Burdick, who were appointed by the trial court and who examined appellant, met the qualifications required under Civil Code section 232, subdivision (a)(6). Each of the doctors made a report and testified that in his opinion appellant is and will remain incapable of supporting or controlling David in a proper manner due to her mental illness. Both doctors testified that appellant suffers from a paranoid-type schizophrenia. Dr. Kelly testified that appellant should be under conservatorship and receive medication. He stated that her mental illness "has been about life long and will probably be life long." He also said ". . . the prognosis is not very good for treatment and it is pretty poor for a cure," although he expressed the opinion that it was *possible* with two to four years daily intensive treatment with psycho-chemicals appellant could become capable of controlling David. He opined, however, that even if the medication were successful, there would be great risk of emotional neglect. He stated that appellant's paranoid delusions present a physical danger to David, that he could be beaten or strangled if he were in appellant's care; in addition, there would at times be a danger of neglect.

Dr. Burdick testified that appellant needed treatment for her mental illness and that he could not foresee a time when she would be stable enough to have David in her care. In Dr. Burdick's opinion, the greatest

danger in placing David with appellant is her potential for neglect and for abandonment, and at times she will become delusional and violent.

Both doctors noted substantial obstacles to securing the needed medical treatment for appellant. Dr. Burdick opined that appellant's nomadic tendencies would seriously hamper attempts to treat her, and Dr. Kelly stated that appellant would probably not submit voluntarily to treatment and that 24-hour restraint would be required, at least initially.

■ In view of the above testimony and the evidence of appellant's repeated failure to seek medical treatment when it was available to her and her failure to cooperate when attempts were made to treat her, there is sufficient evidence to support the trial court's finding that appellant would remain incapable in the foreseeable future of supporting and controlling David in a proper manner.

We turn now to whether reasonable alternatives to severing the parental relationship were adequately explored. ■ It is well recognized that before the parental relationship may be permanently severed, the trial court should consider the availability of less severe alternatives designed to keep the family intact. (*In re Heidi T., supra,* 87 Cal.App.3d 864, 874; *In re Susan M., supra,* 53 Cal.App.3d 300, 310-311.) Each county welfare department is required by Welfare and Institutions Code sections 16500-16511 to provide a systematic program of child protective services, defined as "public social services which supplement, or substitute for, parental care and supervision . . . ." (Welf. & Inst. Code, § 16502.5; see also *In re Heidi T., supra,* 87 Cal.App.3d 864, 874, fn. 8.)

Although the county welfare department did not offer child protective services to appellant prior to filing the petition to free David from her custody, its failure to offer these services does not automatically preclude the trial court from severing the parental relationship. (*In re Rose G.* (1976) 57 Cal.App.3d 406, 421-422 [129 Cal.Rptr. 338]; *In re Susan M., supra,* 53 Cal.App.3d 300, 311.) Where the welfare department fails to offer such services, the trial court has discretion to decide whether to order the services prior to terminating the parental relationship (*ibid.*). In making that decision, the trial court should consider the following: "whether there were mitigating circumstances for the department's failure to consider or offer the services, whether the parent or parents were otherwise eligible and qualified to receive them, whether the furnishing of such services would have been appropriate in the first instance and, if so, whether they could offer a solution to the problems presently at hand, and whether the best interests of the child would be

seriously jeopardized if the proceedings were delayed unduly." (*Id.,* at pp. 311-312, fn. omitted.)

In the instant case, the trial court heard evidence that the child protective services available in Kern County would not have been adequate to deal with appellant's problems. The head of Kern County Child Protective Services testified that because appellant's mental problems are so severe, there is no service that the respondent could provide appellant to enable her to retain custody of David. Dr. Burdick testified that no public agency could provide appellant with any services to enable her to regain custody of David. The only action the child protective services unit could take is to make a referral to a psychiatrist. From appellant's history, it is probable that she would not voluntarily cooperate, if other services were available. In 1973, when the Kern County Welfare Department first came in contact with appellant, she refused any ongoing mental therapy. Even though she lived a few blocks from the Kern Medical Center, she did not seek prenatal care for David or followup treatment for gonorrhea. Because appellant was indigent, the county would have provided her with free medical services. (See Health & Saf. Code, § 1445; Welf. & Inst. Code, § 17000 et seq.) On the basis of this evidence, the trial court expressly found that the available services were not appropriate for the welfare of David. Thus, the trial court considered the less drastic measures and rejected them as being inadequate. From this a finding may be implied that the severance of appellant's parental rights is the least detrimental alternative available to protect David's welfare.

Appellant's final contention is that she was denied procedural due process by the admission into evidence of a probation officer's report prepared by Ms. Schroeder and a social worker's report authored by Ms. Dawson, because she had no opportunity to cross-examine the authors of those reports. Civil Code section 233 provides that such reports are admissible in proceedings to terminate the parental relationship (see *In re Heidi T., supra,* 87 Cal.App.3d 864, 875; *In re George G.* (1977) 68 Cal.App.3d 146, 155-156 [137 Cal.Rptr. 201]). ▉ However, basic fairness requires that when such reports are admitted, the parent must be given a meaningful opportunity to controvert the contents of the report (*id.,* at p. 156). In *George G.,* it was held that the parents were denied their due process right to adequate cross-examination because the sources for all the pertinent information in the probation report were certain "unspecified DPPS records," and the trial court did not grant the parents access to these sources. This prevented the parents from testing the accuracy of the hearsay declarants who were relied on by the author of

the report and also made it impossible for the parents to effectively cross-examine the author (*id.,* at pp. 157-158).

Unlike *George G.,* in the present case there was no infringement on the right to controvert the reports introduced into evidence. Both reports indicated the sources of their information. Moreover, the names and addresses of many of the sources were indicated in the subpoenas which the social worker procured for the dispositional hearing in the juvenile court.[5]

Appellant did not request the right to cross-examine the authors of the reports and there is nothing in the record to suggest that the trial court would not have ordered their appearance for cross-examination if appellant had so requested.

The judgment is affirmed.

Hopper, J., and Creede, J.,* concurred.

---

[5]Appellant did not object to the court's taking judicial notice of the file in juvenile case No. 44945 which included the report prepared by the social worker for the dispositional hearing. Appellant's only objection to the admission of the probation report was that the report contained hearsay and conclusions of the probation officer.

*Assigned by the Chairperson of the Judicial Council.