[No. G015365. Fourth Dist., Div. Three. Dec. 30, 1994.]

In re CODY W., a Person Coming Under the Juvenile Court Law.
ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and
Respondent, v.
JILL V., Defendant and Appellant.

**COUNSEL**

John L. Dodd, under appointment by the Court of Appeal, for Defendant and Appellant.

Terry C. Andrus, County Counsel, and Rachel M. Bavis, Deputy County Counsel, for Plaintiff and Respondent.

Jane B. Winer, under appointment by the Court of Appeal, for Minor.

## OPINION

**CROSBY, J.**—Cody W., born with heroin in his system, was removed from Jill V.'s custody in December 1991, when he was four months old. Jill, a long-time abuser of drugs, was incarcerated in various facilities across the state for much of the next two years. She was in custody, but present in court, when her parental rights were terminated at the selection and implementation hearing.

Most of the issues presented here continue to be routinely raised in dependency appeals, even though this court has consistently rejected them in a host of unpublished opinions. Parents' arguments, preserved by computer technology, have nonetheless taken on an electric life of their own in brief after brief. We publish this opinion in an effort to short-circuit them once and for all.

I

Jill remarkably asserts the juvenile "court made no finding that [she] was an unfit mother . . . [and] basically terminated [her] parental rights based only on findings that [the dependent minor] was adoptable." This contention is belied by the record. Statutory findings of detriment were made at every stage of the proceedings, and they are not challenged.

Nevertheless, relying on *Santosky* v. *Kramer* (1982) 455 U.S. 745 [71 L.Ed.2d 599, 102 S.Ct. 1388], Jill argues Welfare and Institutions Code section 366.26 is unconstitutional because it authorizes termination of parental rights without a finding of parental unfitness. Although she concedes *Cynthia D.* v. *Superior Court* (1993) 5 Cal.4th 242 [19 Cal.Rptr.2d 698, 851 P.2d 1307] "equated the previous findings made at the various hearings that the return of custody to the parents would be detrimental to the child as a finding of 'unfitness,' " she insists *Cynthia D.* did not "directly" reach the due process claim she makes here. Accordingly, she renews it "to preserve [it] for review by the California Supreme Court and [the] United States Supreme Court."

This court has directly reached and rejected the due process issue Jill raises. (*In re Brittany M.* (1993) 19 Cal.App.4th 1396, 1402-1403 [24 Cal.Rptr.2d 57].) And, despite the birth mother's protestations to the contrary, so has our Supreme Court. *Cynthia D.* was a due process case, and there the court noted the various detriment findings demonstrate the requisite "parental inadequacy" and " 'fault' " mandated by *Santosky*. (*Cynthia D.* v. *Superior Court, supra,* 5 Cal.4th at p. 254.) Moreover, observed the court,

"[b]y the time termination is possible under our dependency statutes the danger to the child from parental unfitness is so well established that there is no longer 'reason to believe that positive, nurturing parent-child relationships exist' [citation], and the *parens patriae* interest of the state favoring preservation rather than severance of natural familial bonds has been extinguished." (*Id.* at p. 256.)

The persistence and frequency with which appellate attorneys reproduce the argument, however, appears to be based on the misconception that the words "parental unfitness" are somehow talismanic in the field of juvenile dependency law. They are not. True, courts occasionally employ the phrase (*Cynthia D.* v. *Superior Court, supra,* 5 Cal.4th at p. 256; see also *In re Brittany M., supra,* 19 Cal.App.4th at p. 1403); but 20 years ago the Supreme Court observed, "Thus, prior to the enactment of the Family Law Act in 1969 [former Civil Code, section 4600 et seq.], the decisions had held that an award denying custody to the parent in favor of a nonparent could stand only if the parent had been proven to be unfit. ██ As we shall show, with the enactment of the Family Law Act, the standard of unfitness was dropped and the Legislature created the new rule that in order to award custody of a child to a nonparent the court was required to render a finding that an award to a parent would be 'detrimental to the child' . . . ." (*In re B. G.* (1974) 11 Cal.3d 679, 694-695 [114 Cal.Rptr. 444, 523 P.2d 244]; *In re Carmaleta B.* (1978) 21 Cal.3d 482, 489 [146 Cal.Rptr. 623, 579 P.2d 514]; see also former Civ. Code, § 232, subd. (a)(7).) Recently, the Supreme Court reaffirmed that these findings are "the equivalent of a finding of unfitness" with respect to the child involved. (*In re Jasmon O.* (1994) 8 Cal.4th 398, 423 [33 Cal.Rptr.2d 85, 878 P.2d 1297].)

The detriment language was continued when the dependency laws were revamped in 1989, and with good reason: Despite Jill's protestations to the contrary (see pt. IV *post*), it conveys an infinitely more precise concept than "unfitness" and ensures the juvenile court's focus is properly centered on the absence or breakdown of a relationship between a particular parent and a particular child.

The word "unfitness," on the other hand, can suggest an individual is not a proper parent under any circumstances.[1] Such a blanket dismissal of a fundamental right, without consideration of the unique circumstances of

---

[1]We have found only one set of circumstances where the Legislature has appeared willing to go so far. Per Family Code section 7825 (former Civ. Code, § 232, subd. (a)(4)) and Welfare and Institutions Code section 366.21, subdivision (e), a court may terminate the rights of a parent "convicted of a felony [where] . . . [¶] [t]he facts of the crime . . . are of such a nature so as to prove the unfitness of the parent . . . to have the future custody and control of the child." (See pt. II, *post*.)

each parent/child relationship, would ignore the realities of juvenile dependency litigation: cases where a parent's rights to one or more children have been terminated, while other children remain in the family home, are not uncommon. Clearly, these individuals cannot be labeled as unfit to parent at all; nor would such an all-or-nothing approach generally be desirable.[2] Parental rights to one of several children may be constitutionally severed because it would be *detrimental* to that particular child to maintain them, while it would not be as to the others.[3]

## II

▇▇▇ Arguing an incarcerated parent's rights to a dependent child may be terminated pursuant to Welfare and Institutions Code section 366.26 solely because the parent is incarcerated, while an incarcerated parent's rights to a child who either is not a dependent or became a dependent before 1989 may be terminated under Family Code section 7825 only upon proof that the parent has been "convicted of a felony[] [¶] . . . of such a nature so as to prove the unfitness of the parent . . . to have the future custody and control of the child," Jill contends Welfare and Institutions Code section 366.26 violates equal protection guarantees. The constitutional challenge is purely academic and of no application to this case, however, because Jill's parental rights were not severed based on her mere incarceration.[4] Rather, she lost her parental rights because she failed to "participate regularly in any court-ordered treatment programs[, which constituted] prima facie evidence that return [of the dependent minor] would be detrimental." (Welf. & Inst. Code, §§ 366.22, subd. (a), 366.26, subd. (c).)

## III

The next constitutional salvo, rejected in several appellate decisions, is another equal protection challenge to Welfare and Institutions Code section 366.26. This one is based on the assertion that individuals whose parental rights are terminated pursuant to Family Code section 7828 (former Civ.

[2]We do not mean to imply that this court encourages the separation of siblings, far from it.

[3]Jill's corollary argument, supported only with a citation to *Santosky* v. *Kramer, supra,* 455 U.S. 745, is that the statutory scheme is somehow constitutionally flawed because the detriment finding is not contemporaneous with the order severing parental rights. But in *Cynthia D.* v. *Superior Court, supra,* 5 Cal.4th 242, the Supreme Court explained the selection and implementation hearing is not the place to litigate "parental inadequacy." (*Id.* at p. 254.) Where the termination of parental rights is contemplated, the selection and implementation hearing gives the social services agency the opportunity to establish the likelihood the minor will be adopted and to determine whether "termination would be detrimental to the minor due to one of [several statutory] circumstances." (Welf. & Inst. Code, § 366.26, subd. (c)(1).)

[4]Nor could they be under the dependency statutes. (Welf. & Inst. Code, §§ 366.21, subd. (e), 366.26.)

Code, § 232, subd. (a)(7)) are accorded greater protection than those whose parental rights are severed pursuant to section 366.26. **(3)** But birth parents whose parental rights are terminated under the Welfare and Institutions Code are not similarly situated to birth parents whose children fall under the Family Code provisions for freedom from parental custody and control.[5] There is no equal protection violation. (*In re Vanessa W.* (1993) 17 Cal.App.4th 800 [21 Cal.Rptr.2d 633]; *In re Edward R.* (1993) 12 Cal.App.4th 116 [15 Cal.Rptr.2d 308].)

## IV

■ The birth mother's constitutional attack on the dependency scheme's failure to define "detriment" is not worthy of extended discussion. As discussed in part I, "detriment" has been at the core of the dependency system for at least a generation. Under statutes in effect since 1989, a dependent child who is removed from parental custody pursuant to Welfare and Institutions Code section 361 cannot be returned if the court finds by a preponderance of the evidence "that the return of the child would create a substantial risk of detriment to the physical or emotional well-being of the minor." (Welf. & Inst. Code, § 366.21, subds. (e), (f).) Both subdivisions then explain, "The failure of the parent or guardian to participate regularly in any court-ordered treatment programs shall constitute prima facie evidence that return would be detrimental." There is nothing vague or subjective about that evidentiary standard, although it is not exclusive, of course. In general, detriment is well understood to simply mean—weighing all relevant factors—expected net harm to a child as the result of his or her return to parental custody.

## V

■ The final boilerplate issue is also commonly reproduced in appeals from a judgment terminating parental rights. There are several versions of the argument, but the one Jill proffers is typical: "Termination of parental rights is an impingement of a fundamental right which automatically invokes the least detrimental alternative requirement. The trial court erred in failing

---

[5]Family Code section 7808 decrees that "[t]his part [of the statutory scheme] does not apply to a minor adjudged a dependent child of the juvenile court pursuant to subdivision (c) of [s]ection 360 of the Welfare and Institutions Code on and after January 1, 1989, during the period in which the minor is a dependent child of the court. For those minors, the exclusive means for the termination of parental rights are provided in . . . [¶] (a) Section 366.26 of the Welfare and Institutions Code. [¶] (b) Sections 8604 to 8606, inclusive, and 8700 of this code. [¶] (c) Chapter 5 (commencing with Section 7660) of Part 3 of this division of this code." Minors who are not dependents of the juvenile court or whose dependency was established before 1989 fall within the provisions of section 7800 et seq. of the Family Code.

to adopt an alternative less drastic [than] termination of parental rights." She concludes, "[t]he court should have adopted the less drastic alternative of guardianship or long-term foster care."

The concepts of "least detrimental" and "less drastic" or "less severe" alternatives had their genesis long before the current statutory scheme was enacted and invariably involved individuals whose parental rights were to be "immediately" terminated, i.e., without any rehabilitation or reunification services.[6] (E.g., *In re Susan M.* (1975) 53 Cal.App.3d 300 [125 Cal.Rptr. 707].)[7] Most of the decisions also were concerned with parents who were mentally ill and allegedly unable to care for their children for that reason. (*In re Carmaleta B.*, *supra*, 21 Cal.3d at p. 489.)

In the cases involving mental illness, the "less drastic" or "less severe" and "least detrimental" alternative language in appellate opinions referred to the decision to provide or withhold rehabilitation or reunification services before termination of parental rights. *In re David B.* (1979) 91 Cal.App.3d 184 [154 Cal.Rptr. 63] was one of the earlier decisions of this sort. The birth mother was mentally ill, and the trial court determined she could not benefit from reunification services. Her parental rights were terminated 12 months after the baby was born. The appellate court found no due process deprivation, noting parental rights could constitutionally be terminated under former Civil Code section 232, subdivision (a)(6) based on a parent's mental illness, so long as least two physicians certified the mental illness is not amenable to treatment and "the immediate severance of the parental relationship [was] the *least detrimental alternative* available to protect the welfare of the child.

---

[6]Tracing repealed and superseded statutes can be a tricky business. But the following seems fairly clear: Until 1982, when subdivision (e) was added to Welfare and Institutions Code section 361, the Legislature had little to say concerning reunification services. Subdivision (e) did not provide significant guidance. It read simply, "The juvenile court shall order the probation officer to provide child welfare services to the minor and the minor's parents or guardians for the purpose of facilitating reunification of the family within a maximum time period not to exceed 12 months. Services may be extended up to an additional six months if it can be shown that the objectives of the service plan can be achieved within the extended time period. Physical custody of the minor by the parents or guardians during the 18-month period shall not serve to interrupt the running of the period." In 1986, a new section 361.5 was added; and for the first time juvenile courts received a detailed outline of the circumstances that would justify the denial of reunification services.

[7]In *Susan M.* the Court of Appeal "subscribe[d] to the thesis that all avenues should be explored by the courts, the state and state agencies before a child is declared free from the custody and control of its parents and placed for adoption. . . . Accordingly, we embrace the viewpoint that before initiating proceedings to declare a minor free from the custody of its parents under section 232 of the Civil Code, a county welfare department must consider child protective services as a possible solution to the problems at hand and must offer such services to qualified parents if deemed appropriate under the circumstances." (*In re Susan M.*, *supra*, 53 Cal.App.3d at pp. 310-311.)

In this regard, the judge must carefully explore all reasonable alternatives to severing the parent relationship such as child protective services and temporary foster home care pending efforts to rehabilitate the parent. These alternatives should be employed unless they would result in serious psychological harm to the child. However, if the court determines that available medical and social resources are inadequate to rehabilitate the parent to a level where he or she will be able to assume responsibility for the child, then it becomes inimical to the child's welfare to delay efforts to seek permanent adoptive placement." (91 Cal.App.3d at p. 196.)

The appellate panel in *David B.* reviewed the trial court's decision not to order reunification services and concluded the judge "considered the less drastic measures [rehabilitation and reunification] and rejected them as being inadequate. From this a finding may be implied that the severance of [the birth mother's] parental rights is the least detrimental alternative available to protect [the minor's] welfare." (91 Cal.App.3d at p. 199; see also *In re R. S.* (1985) 167 Cal.App.3d 946 [213 Cal.Rptr. 690] [an implied finding that immediate termination of parental rights was the least detrimental alternative could not be supported where the trial court failed to consider offering rehabilitation services to a mentally ill mother who privately placed a child with prospective adoptive parents, but sought to regain custody]; *In re Heidi T.* (1978) 87 Cal.App.3d 864, 874 [151 Cal.Rptr. 263] [affirming the termination of a birth mother's rights based on her mental illness under former Civ. Code, § 232, subd. (a)(6) even though no referral was ever made to the county's child protective services].)

*In re Angelia P.* (1981) 28 Cal.3d 908 13 [171 Cal.Rptr. 637, 623 P.2d 198] became a turning point—intentional or not—in the least detrimental alternative analysis. Although neither parent was mentally ill,[8] the court discussed the concept of least detrimental alternative. The analysis primarily focused on the competing interests that may override a parent's fundamental right to custody of his or her child. In that regard the court also cited a 1973 text (Goldstein et al., Beyond the Best Interests of the Child), noting the authors recommended " ' "the least detrimental available alternative for safeguarding the child's growth and development" ' as a standard on the ground that the 'best interest test' too often subordinates the child's interests to those of various adult claimants." (28 Cal.3d at p. 917.) But, as in the earlier Court of Appeal decisions, the Supreme Court made it clear that "less severe alternatives" meant no more than giving birth parents the opportunity to rehabilitate themselves and reunite with their families via court-ordered services before ordering the termination of their rights.

---

[8]The birth father was in prison for felony abuse of Angelia. The birth mother, who had custody of a younger child born after her husband's incarceration, could not afford to care for Angelia, too, and did not want the dependent minor returned to her care at that time.

The parents in *Angelia* contended, "the trial court failed to consider alternate care plans for Angelia . . . the possibility of maintaining the status quo until" the birth father was released from prison and could receive counseling. The Supreme Court disagreed, citing *David B.* and *Susan M.*: "[T]he trial court should consider the availability of less severe alternatives designed to keep the family intact.' [Citation.] However, when *such services* have not been offered, 'the decision as to whether the services should be ordered and the [termination of parental rights] delayed until the results are evaluated lies within the sound discretion of the superior court.' " (*In re Angelia P.*, *supra*, 28 Cal.3d at p. 923, italics added.) But the court concluded the previous four years of foster care constituted the less severe alternative aimed at preserving the family and left the trial court "free to decide that termination was appropriate." (*Ibid.*)

The "least detrimental alternative" concept appears to have been subsumed in Welfare and Institutions Code section 361.5 (see fn. 5), which codified in considerable detail requirements for child welfare services. To the extent the concept survived the enactment of the current statutory scheme, it means no more today than it meant 19 years ago: Should parental rights be terminated immediately without the provision of child welfare services designed to facilitate reunification of the family?[9] ■ It has never meant, as Jill suggests, that the juvenile court, at the selection and implementation hearing, must first consider long-term foster care or guardianship before adoption.

That notion, besides being unprecedented, would turn the current dependency scheme upside down. Once efforts at reunification have been formally terminated, Welfare and Institutions Code section 366.26 clearly spells out the judicial options and, "[a]s a matter of public policy, the juvenile court gives *first priority to adoption as the most desirable permanent plan.*" (*In re Edward R.*, *supra*, 12 Cal.App.4th at p. 122, italics added.) Once the court has "determine[d] by clear and convincing evidence that it is likely that the minor will be adopted" and concluded that none of the four statutory circumstances would create a detriment to the child (Welf. & Inst. Code, § 366.26, subd. (c)(1)), " ' "the decision to terminate parental rights [at the section 366.26 hearing] *will be relatively automatic.*" ' " (*In re Matthew C.* (1993) 6 Cal.4th 386, 392 [24 Cal.Rptr.2d 765, 862 P.2d 765], italics added.)

---

[9]Also, the court's mandate has always been to ensure that its decision is "the least detrimental alternative *for the children.*" (*In re Carmaleta B.*, *supra*, 21 Cal.3d at p. 489, italics added.) Termination of parental rights is rarely the least detrimental alternative for a parent, but that is not the test. (*In re Jasmon O.*, *supra*, 8 Cal.4th at p. 426.)

Legal guardianship and long-term foster care are not considered by the court until adoption and termination of parental rights have been rejected: "If the court finds that adoption of the minor or termination of parental rights is not in the interests of the minor, or that one of the conditions in subparagraph (A), (B), (C), or (D) of paragraph (1) or in paragraph (2) applies, the court shall [then] either order that the present caretakers or other appropriate persons shall become legal guardians of the minor or order that the minor remain in long-term foster care. Legal guardianship shall be considered before long-term foster care, if it is in the best interests of the child and if a suitable guardian can be found. . . ." (Welf. & Inst. Code, § 366.26, subd. (c)(4).)

Here, reunification services were terminated and the juvenile court found that Cody probably would be adopted. No more was required: "[I]n order to terminate parental rights, the court need only make two findings: (1) that there is clear and convincing evidence that the minor will be adopted; and (2) that there has been a previous determination that reunification services shall be terminated." (*Cynthia D.* v. *Superior Court*, *supra*, 5 Cal.4th 242, 249-250.)

## VI

Jill launches inconsistent attacks on the court's determination that reasonable reunification services were provided. On one hand she complains each reunification plan was inadequate because it was "generic [and] . . . did not address [her] incarcerations." On the other, she faults the Orange County Social Services Agency (SSA) for failing to facilitate monthly visits during her various incarcerations, as required by the express terms of the plans.[10]

But this birth mother waived any right to challenge the plans themselves: At each stage she stipulated to their terms. She also agreed at the six- and twelve-month reviews to the reasonableness of the reunification services provided. The only issue properly before this court, then, is the reasonableness of the SSA's efforts to implement the last plan between February 22, 1993, the date of the 12-month review, and July 29, 1993, when reunification services were terminated.

Candidly, the SSA did virtually nothing to foster reunification during those six months. Under the circumstances, however, that was reasonable.

---

[10]For all referral orders entered after January 1, 1995, a challenge to the reunification plan will not be preserved for an appeal after the judgment terminating parental rights (see *In re Matthew C.*, *supra*, 6 Cal.3d 386), unless a timely petition for extraordinary relief was filed and either "summarily denied or otherwise not decided on the merits." (Cal. Rules of Court, rules 39.1A(b)(2), 39.1B(d)(2), 39.2(b)(2), 1436.5(c)(2).)

The birth mother was released from custody in January 1993 and visited Cody on February 4. She was arrested on February 16 and released from the Orange County jail in March. She did not advise the SSA of her whereabouts upon this release, however. It was not until June that the SSA's efforts to find her were successful; Jill was located in custody in Chowchilla, more than 200 miles from Orange County. There she remained until one day before the eighteen-month review on July 29, 1993. The plan in effect during this period required her to keep the social worker "apprised of her current whereabouts at all times." It also authorized weekly monitored visits, "provided [the birth mother] is not under the influence of drugs or alcohol, and visitation will be increased provided she is complying with the [c]ourt-ordered service plan. While incarcerated in a *county facility*, the minor's mother to be granted monthly visits." (Italics added.) As the birth mother failed to keep the SSA apprised of her whereabouts and was incarcerated in Orange County for only several weeks during the final six months of reunification, the SSA was not obliged to do much.

Moreover, Jill's failure to establish a maternal bond with her son was not the result of the SSA's failure to transport the infant to various custodial institutions for visits. It was the result of her inability to remain drug free and out of custody for any appreciable length of time. Jill's lack of responsibility in this regard made the juvenile court's finding under Welfare and Institutions Code section 366.26, subdivision (c)(1)(A) essentially superfluous, as the county argues. Where parents "have maintained regular visitation and contact with the minor," the court may conclude the dependent child would benefit from continuing that contact. (Welf. & Inst. Code, § 366.26, subd. (c)(1)(A).) But where, as here, there has been no regular contact, this subdivision does not even come into play.

VII

Having emptied one quiver against the SSA, the birth mother takes aim at her trial counsel for providing ineffective assistance, e.g., stipulating to irrelevant service plans and not insisting on visitation while she was incarcerated. This argument, as the previous ones we have rejected, ignores the obvious: This birth mother's predicament was largely of her own making. Cody is the fourth child removed from her custody, and none has been returned. For the first 28 months of this minor's life, his birth mother was unable or unwilling to give up drugs and crime. She was unable or unwilling to establish a home or a legal source of income. She was unable or unwilling to demonstrate a commitment to learning minimal parenting skills. She did

not receive ineffective assistance of counsel; sadly, her son had an ineffective mother.[11]

Judgment affirmed.

Wallin, Acting P. J., and Sonenshine, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 16, 1995.

---

[11]As we have found no error, there is no need to reach the issue of cumulative impact.