[Civ. No. 18637. Fourth Dist., Div. One. May 28, 1980.]

In re JACK H. et al., Minors.
HOMER DETRICH, as Director, etc., Petitioner and Respondent, v.
DOROTHY H., Objector and Appellant.

**Counsel**

Appellate Defenders, Inc., under appointment by the Court of Appeal, Michael Lloyd and Paul Bell for Objector and Appellant.

Donald L. Clark, County Counsel, Lloyd M. Harmon, Jr., Chief Deputy County Counsel, and Arlene Prater, Deputy County Counsel, for Petitioner and Respondent.

**Opinion**

**STANIFORTH, Acting P. J.**—Dorothy H., the mother of Jack H. and James H., appeals an order of the superior court declaring these children free from her custody and control pursuant to Civil Code section 232, subdivisions (a)(1), (2) and (7).[1]

Jack and James[2] are but two of nine children born to the mother (Dorothy) during two prior marriages. Dorothy met Julio M. (M.) after her second divorce. In 1971 they commenced living together with several of her children, including Jack and James. These children were removed from the mother's home February 15, 1972, by court order resulting from a juvenile court custody proceeding brought under section 600, subdivision (b) (now § 300, subd. (b)) of the Welfare and Institu-

---

[1] All reference is to the Civil Code unless otherwise specified.

[2] The natural father has relinquished his rights of custody and control over these two boys.

tions Code. The juvenile court found Jack and James to be dependent children. Evidence adduced at that hearing described the children as "poorly dressed, without adequate food supplies," and left in the sole care of Dorothy's 14-year-old daughter, alleged to be mentally deficient. There were suggestions of child abuse by M. but the juvenile court record discloses no true finding on this charge. Based upon this evidence, that court (Mar. 10, 1972) ordered custody be taken from the mother and the two boys (Jack and James) were placed in the foster home of Charles and Hilda O'Connor where they have since remained.

The juvenile court has annually reviewed and continued the dependency status. Harriett Broadhurst, the Department of Public Welfare social worker assigned to the case, met often with the mother and testified that as early as 1973 the mother's life was stabilizing. Broadhurst encouraged her to obtain quarters larger than the one-bedroom apartment in which the mother then lived with M. Visitation of Jack and James was restricted to the foster home during daylight hours by Broadhurst's arrangement. Before 1977, the mother exercised her visitation rights sparingly by visits totalling four annually on birthdays and holidays. She expressed a fear that too frequent visits would upset the children. However, in 1977 she began to visit every two weeks. When the mother appeared at the foster home, the children were always happy to see her, and she made appropriate inquiry into the children's welfare. However, all visitation rights were suspended by authorities in March 1978 upon the premise that the mother's regular visits did in fact disrupt the foster home.

Throughout this entire six-year period, no plan was developed to return Jack and James to the parent. Neither were "child protective services" mentioned in federal aid to families with dependent children (42 U.S.C. §§ 620-626) and implemented by sections 16500 through 16511 of the Welfare and Institutions Code considered. The mother did consider county mental health services and Broadhurst approved. In 1975 the mother was told the county would seek freedom from custody and control as no plan for returning custody appeared on the horizon. When asked if the mother was capable of providing for Jack and James, Broadhurst expressed doubt in light of the "instability" of her relationship with M. Broadhurst attached great importance to M.'s statement he expected certain responsibilities from the children and would physically discipline them under appropriate circumstances. Further, M. was said to have offered to leave Dorothy to aid her obtaining custody.

At trial, the mother testified she wanted the boys returned. Testimony of the two boys was not offered. The trial court did not, *sua sponte*, inquire into either Jack or James' preference under section 4600. Instead the court found abandonment under section 232, subdivision (a)(1), reasoning Dorothy's efforts to communicate with the children were token. The court also made a finding of parental neglect (§ 232, subd. (a)(2)) in that the mother failed to provide "parental love, affection, and nurturing which were reasonably possible in the circumstances by way of doing whatever she reasonably could to exercise visitation privileges." Finally the court found clear and convincing evidence that present circumstances indicated "a return to the parent... would be detrimental to the children, ...the parent has failed during the statutory period and is likely to fail in the future...." The court then made an interlocutory judgment declaring the children free from the custody of the mother, but staying its effect for six months. "[T]he court will reconsider the matter at the end of said six month period if the circumstances of respondent have substantially changed." This proviso reflected the trial judge's voiced concern for the mother's dependency on M.; that relationship and "the problems it presented seriously interfered with any ability she had to get return of [her] children" said the court. Further, "Mr. M. is my primary concern. I do not intend that those children ever go into a house where their mother and Mr. M. are maintaining that relationship because I think that that would be a serious threat to their well-being...."

"This means in substance that if she is willing, now, to make this choice to sever the relationship with M. and accept these children and be responsible for them—and I am not talking about M.'s financial support. If he wants to provide that, that is just fine, but I would not even permit this if I thought those children were going to go in a house where he was the paternal parent or acting in any paternal capacity."

Six months later supplemental proceedings were held. The mother had established a residence separate from M. She had moved into a two-bedroom residence with three of her children and intended to obtain a still larger house. During this period there was substantial evidence of meaningful contact between Dorothy and M. The court concluded the circumstances were the same and rendered its final judgment.

Dorothy contends a lack of substantial evidence to support the trial judge's finding of abandonment, neglect and detriment and points to the

court's reliance on her relationship with M. as a controlling fact on the issue of abandonment. She also asserts error in the court's failure to appoint independent counsel for the minors or inquire into their custodial preference under section 4600 and the failure to explore alternatives such as "child protective services."

The Department of Public Welfare (Detrich) urges substantial evidence supports the trial court's findings of abandonment, neglect and foster care for a two-year period plus detriment to the children if custody were returned to the parent.

## Discussion

### I

In these proceedings, the stakes transcend mere custodial visitation rights, for the state seeks to forever terminate the mother's custodial visitation rights in these children to make them available for adoption. (*In re Cynthia K.* (1977) 75 Cal.App.3d 81, 84 [141 Cal.Rptr. 875].) Fundamental rights of both child and parents are involved. ■ The courts have long taken the position that the right to conceive and raise one's children have been deemed essential, basic civil rights of man and rights far more precious than property. (*Stanley* v. *Illinois* (1972) 405 U.S. 645, 651 [31 L.Ed.2d 551, 558, 92 S.Ct. 1208, 1212].) The involuntary termination of the relationship of a natural parent to her children must be viewed as a drastic remedy which should be resorted to only in extreme cases of neglect or abandonment (*In re T. M. R.* (1974) 41 Cal.App.3d 694, 703 [116 Cal.Rptr. 292]) and only when no reasonable alternative appears on the horizon. (*In re Heidi T.* (1978) 87 Cal.App.3d 864, 874 [151 Cal.Rptr. 263].) This prescript includes continuing foster care. (*In re David B.* (1979) 91 Cal.App.3d 184, 193 [154 Cal.Rptr. 63].)

"Although a home environment may appear deficient when measured by dominant socioeconomic standards, interposition by the powerful arm of the public authorities may lead to worse alternatives." (*In re Raya* (1967) 255 Cal.App.2d 260, 265 [63 Cal.Rptr. 252]; fn. omitted.) When assessing the initial dependency status of Jack and James in 1972, no alternatives were considered. The record is bare of any attempt to maintain the family unit and provide "child protective services." Moreover, there is a patent indifference to natural familial

bonds. (*In re Carmaleta B.* (1978) 21 Cal.3d 482, 489 [146 Cal.Rptr. 623, 579 P.2d 514].)

## II

Section 232, subdivision (a)(1)[3] manifests the legislative intent that termination of parental relationship becomes the least detrimental alternative for a child where the parent has abandoned that child. (Cf., *In re Carmaleta B., supra*, 21 Cal.3d 482, 489.) ■ But, to sustain a finding of abandonment, the trial court must find by "clear and convincing evidence" (*In re Heidi T., supra*, 87 Cal.App.3d 864, 870) the children were left by the parent to the care and custody of another for six months *with intent to abandon.* Intent may be presumed from failure to provide for or communicate with the minor. (§ 232, subd. (a)(1).) A judicial removal of a child cannot in and of itself constitute an abandonment. (*In re George G.* (1977) 68 Cal.App.3d 146, 162 [137 Cal.Rptr. 201].) Nevertheless, nonaction of a parent may under certain circumstances transform a judicial taking into a parental abandonment. (*In re Jacqueline H.* (1979) 94 Cal.App.3d 808, 816 [156 Cal.Rptr. 765].)

Here the trial judge found just such inaction by the process of deeming the mother's communications, visits, etc. with Jack and James "token," thereby manifesting her intent to abandon. The evidence was disputed below as to the extent of restriction placed upon the visitation privileges of the mother and the trial court concluded the only restriction to be to the foster home. However, the record is unclear whether the court's finding was based solely upon a determination of the nature

---

[3]Civil Code section 232, subdivision (a)(1) in pertinent part provides: "Who has been left without provision for his identification by his parent or parents or by others or has been left by both of his parents or his sole parent in the care and custody of another for a period of six months or by one parent in the care and custody of the other parent for a period of one year without any provision for his support, or without communication from such parent or parents, with the intent on the part of such parent or parents to abandon such person. Such failure to provide identification, failure to provide, or failure to communicate shall be presumptive evidence of the intent to abandon. Such person shall be deemed and called a person abandoned by the parent or parents abandoning him. If in the opinion of the court the evidence indicates that such parent or parents have made only token efforts to support or communicate with the child, the court may declare the child abandoned by such parent or parents. . . . [¶] The fact that a child is in a foster care home, licensed under Chapter 3 (commencing with Section 1500) of Division 2 of the Health and Safety Code, shall not prevent a licensed adoption agency which is planning adoption placement for the child, from instituting, under this subdivision, an action to declare such child free from the custody and control of his parents."

of the actual restrictions and ignoring the mother's good faith belief that her visitation rights were more limited. Such factual uncertainty is critical since the mother's subjective *intent to abandon* is the controlling issue. The foster parents concede the mother's concern that more numerous visits would upset the children and the juvenile authorities confirm the mother's thinking. These concerns while not of themselves adequate to overturn the finding of abandonment, nevertheless subtract from that clear and convincing quantum of evidence supporting the court's judgment.

A pure quantitative test as basis for a court's finding of "token" communication is not supported by case law. Rather the court must examine into the genuineness of the mother's efforts at communications under all the circumstances. (See e.g., *In re Susan M.* (1975) 53 Cal. App.3d 300, 308-309 [125 Cal.Rptr. 707]; *In re T. M. R., supra,* 41 Cal.App.3d 694, 698-699; *Adoption of Oukes* (1971) 14 Cal.App.3d 459, 466-467 [92 Cal.Rptr. 390].) The trial court's application of such a quantitative test is reflected in its conclusion Dorothy's communications were token even though she maintained an "honest desire to have the children." The mother's "honest desire to have the children" is inconsistent as a matter of logic with an intent to abandon.

The lack of the evidence to support the finding of an intent to abandon becomes even more stark in light of the trial court's willingness to suspend a finding of abandonment if the mother would "sever the relationship with M." The trial court's preoccupation with the M. relationship as a factor bearing upon a finding of abandonment or neglect demonstrates a fundamental confusion of issues. ▇ While the man with whom the mother maintains a relationship may be relevant to the *fitness* of the mother's home as a place for custody (*In re Carmaleta B., supra,* 21 Cal.3d 482, 488), that relationship is not relevant without a further factual showing of a rational, logical relationship to the fact in issue—the mother's intent to abandon her children—in this, an action seeking to sever the parental relationship completely. (*In re Melissa H.* (1974) 38 Cal.App.3d 173, 175 [113 Cal.Rptr. 139].) As this court stated in *In re Nicole B.* (1979) 93 Cal.App.3d 874, 881, footnote 5 [155 Cal.Rptr. 916]: "This sort of a permanent termination of rights *requires evidence of a different nature.*" (Italics added.) The termination of all parental rights must be reserved for the "extreme cases of *neglect* or *abandonment.*" (*In re T. M. R., supra,* 41 Cal. App.3d 694, 703; italics added; *In re George G., supra,* 68 Cal.App.3d 146, 165.)

## III

Similarly, the trial court's determination of neglect arose in the irrelevant context of a choice between continuing the relationship with M. and a return of Jack and James. "Neglect" pursuant to section 232, subdivision (a)(2), authorizes termination from custody and control for a minor "[w]ho has been cruelly treated or neglected by either or both of his parents, if such person has been a dependent child of the juvenile court, and such parent or parents have been deprived of his custody for the period of one year prior to the filing of a petition praying that he be declared free from the custody and control of such cruel or neglectful parent or parents."

The mother asserts the trial court improvidently relied upon the dependency status of Jack and James in adjudging Dorothy neglectful under section 232, subdivision (a)(2). We agree. As this court explained in *In re Nicole B., supra*, 93 Cal.App.3d 874, the Legislature's desire to protect children (formerly Welf. & Inst. Code, § 600 [now § 300]) authorized four circumstances for adjudging dependency status of the child. To be distinguished, of course, are proceedings under Civil Code section 232, subdivisions (a)(2) and (a)(6), where the child is to be declared free from custody and control of the parent. (See *In re Carmaleta B., supra*, 21 Cal.3d 482, 489; *In re Nicole B., supra*, 93 Cal.App.3d 874, 881, fn. 5.)

■  The fact the juvenile court in 1972 adjudged Jack and James dependent minors "who [were] destitute, or who [were] not provided with the necessities of life...or suitable place of abode" (Welf. & Inst. Code, § 600, subd. (b) [now § 300, subd. (b)]) is insufficient to sustain a finding of neglect under section 232. Nor did the continuation of dependency status under section 600, subdivision (a) (now § 300, subd. (a)) of Welfare and Institutions Code alter this basic inadequacy. Neglect under section 232 embraces a more narrow definition than grounds for declaring dependency. This provision becomes relevant for declaring a minor free from custody and control in situations where the child was found to be dependent *because of cruel or neglectful conduct of parents* under Welfare and Institutions Code section 600, subdivision (d) (now § 300, subd. (d)). (*In re T. M. R., supra*, 41 Cal.App.3d 694, 700.) Neither financial inability to provide necessities nor a less than ideal home environment are of themselves coextensive with the culpable neglect necessary to sever all familial ties. (See, e.g., *In re Reyna* (1976) 55 Cal.App.3d 288, 302 [126 Cal.Rptr. 138]; *Adoption of*

*Oukes, supra*, 14 Cal.App.3d 459, 465; *Guardianship of Pankey* (1974) 38 Cal.App.3d 919, 932 [113 Cal.Rptr. 858].)

The parent-child relationship should be permanently severed only when there has been demonstrable extreme cases of neglect. (See *In re Carmaleta B., supra*, 21 Cal.3d 482, 489; *In re D. L. C.* (1976) 54 Cal.App.3d 840 [126 Cal.Rptr. 863]; *In re Susan M., supra*, 53 Cal. App.3d 300; *In re Halamuda* (1948) 85 Cal.App.2d 219 [192 P.2d 781].) A state act is arbitrary and capricious if it permanently deprived the parent of the fundamental liberty of raising a family for mere neglect under Civil Code section 232, subdivisions (a)(2) or (a)(7). In like manner, interference with the fundamental liberty of a child to be raised by his or her parents cannot constitutionally be countenanced by a mere showing of neglect. To permit intervention for mere neglect would be to permit the state to interfere with impunity in the affairs of any family. (See *In re B. G.* (1974) 11 Cal.3d, 679, 694 [114 Cal.Rptr. 444, 523 P.2d 244].)

The trial judge here in applying section 232, subdivision (a)(2), stated "I am *assuming* that there was a determination of negligence...in that she failed to provide reasonable and adequate supervision...." (Italics added.) No such assumption is sanctioned by section 232. Dorothy was entitled "to have the circumstances leading to the earlier order reviewed in light of subsequent events, and with consideration of the nature of the order sought in the second proceedings." (*In re Morrow* (1970) 9 Cal.App.3d 39, 55 [88 Cal.Rptr. 142].) "Detriment" must be found in the present circumstance rather than upon assumptions as to circumstances thought to have existed at the time of the 1972 dependency evaluation. (*In re James M.* (1976) 65 Cal.App.3d 254, 265 [135 Cal.Rptr. 222].)

Detrich points to the trial court's reliance on lack of visitation and the relationship with M. to manifest a "deprivation of the emotional stimulus and outward love and affection to which the child is entitled" constituting "neglect." (*In re Morrow, supra*, 9 Cal.App.3d 39, 57.) This reasoning, however, is grounded on the same factual infirmities that flaw the court's finding of "abandonment."

### *Section 232, Subdivision (a)(7)*

Next, the mother attacks the sufficiency of the court's conclusion (1) that freedom from custody and control was warranted as Jack and

James had remained in foster care more than two consecutive years, and (2) clear and convincing evidence establishes their return to Dorothy at this time would be detrimental.[4] The "detriment" to the children was here predicated upon the court's belief the mother could not provide a suitable home *where M. would not be acting in any parental capacity.*

While the court's concerns about the mother and M. were irrelevant with respect to the charge of abandonment and neglect of the children, a parent's relationship to a live-in nonspouse may be relevant to determine the suitability of the home. (*In re Carmaleta, supra*, 21 Cal.3d 482; *In re Jacqueline H., supra*, 94 Cal.App.3d 808.) ■ The lower court found detriment only as "[t]hat man simply is not going to take care of these children" based upon evidence in the record M. did not wish to be legally obliged to support and care for the boys. This is not the species of "detriment" contemplated by section 232, subdivision (a)(7).

Detrich cites *In re Carmaleta, supra*, 21 Cal.3d 482, and *In re Jacqueline H., supra*, 94 Cal.App.3d 808, as authority permitting scrutiny of the natural parents' relationship with another. These cases are inapposite, for both focus on remedying aggravated physical and/or sexual abuse of minors by a father figure. No substantial evidence supports such an allegation against the mother's home. Thus the trial court's "primary concern" with the morality of unmarried adults' cohabitation lacks an evidentiary base for the necessary causal nexus to authorize its use as the basis of finding the unfitness of their home. (*In re A. J.* (1969) 274 Cal.App.2d 199, 202-203 [78 Cal.Rptr. 880]; *In re Raya, supra*, 255 Cal.App.2d 260, 265-266.) In short, evidence of immorality must be connected causally to a detrimental effect on the children's

---

[4]Civil Code section 232, subdivision (a)(7) provides: "Who has been cared for in one or more foster homes, residential facilities licensed pursuant to Chapter 3 (commencing with Section 1500) of Division 2 of the Health and Safety Code, or health facilities licensed pursuant to Chapter 2 (commencing with Section 1250) of Division 2 of the Health and Safety Code, under the supervision of the juvenile court, the county welfare department or other public or private licensed child-placing agency for two or more consecutive years, providing that the court finds by clear and convincing evidence that return of the child to his parent or parents would be detrimental to the child and that the parent or parents have failed during such period, and are likely to fail in the future, to do the following: [¶] (i) Provide a home for the child; [¶] (ii) Provide care and control for the child; and [¶] (iii) Maintain an adequate parental relationship with the child. [¶] Physical custody of the child by the parent or parents for insubstantial periods of time during the required two-year period will not serve to interrupt the running of such period."

welfare. The trial court's determination of detriment here is not supported by substantial evidence.

Error as to any of the trial court findings impermissibly taints its exercise of discretion affecting this most fundamental civil right; therefore, any one alone is sufficient for reversal. (*In re Carmaleta B., supra*, 21 Cal.3d 482, 495-496.)

Furthermore, there is an absence of any explanation why neither minor was questioned by the court to enlist their aid in assessing the paramount directive of the courts to protect the best interests of the child. (§ 232.5.) While there is no absolute requirement that minors always be interviewed, yet section 4600, subdivision (a), expresses clearly the legislative preference: "If a child is of sufficient age and capacity to reason so as to form an intelligent preference as to custody, the court *shall* consider and give due weight to the wishes of the child...." (Italics added.) More is at stake in a section 232 proceeding than mere custody; a fortiori any child, who meets the statutory criteria, should be given an opportunity to plead that most natural of human needs: to open and maintain a channel of communication with a natural parent.

Jack was age 13 and James age 8. The trial judge's firsthand impressions of the child's preferences would have proven invaluable. This need for the child's preferences is particularly true in light of conflicting "hearsay" testimony as to the children's relationship with the mother. The foster mother testified the children were always happy to see their mother. James enjoyed his mother's visits and would go home with her if she asked. The probation report suggested the visits were harmful to the children.

The trial judge recognized some importance to the children's desire. He acknowledged the older boy, Jack, had an unreported conversation in chambers with the *presiding* judge. The contents of this conversation was never evidenced for the benefit of the trial judge. The fact the child conferred with *a* judge does not discharge *the* trial judge's duty to exercise his discretion fully apprised of facts deemed significant by statute.

Finally, an inquiry of the boys would aid the court in performing its duty to exercise an informed discretion with a view to appointing independent counsel for Jack and James. The children's interest was here *presumed* to be allied with the state in terminating the mother's relationship. While the court in *In re Richard E.* (1978) 21 Cal.3d 349

[146 Cal.Rptr. 604, 579 P.2d 495], did not deem failure to appoint independent counsel for minors reversible error per se, yet the majority stated "in absence of a showing on the issue of the need for independent counsel for a minor, failure to appoint constitutes error." (*Id.*, at p. 354.) Thus, counsel must be appointed at the commencement of proceedings on retrial unless there is "an immediate showing upon which the court can exercise its discretion against making an appointment." (*Id.*, at p. 355.)

The drastic nature of the remedy sought calls forth the incisive observation of our Chief Justice: "'The Legislature's recognition of the rights of personality of the child as the touchstone of proceedings to free him from parental custody and control is evidenced by its mandate in Civil Code section 232.5 that the statutory scheme "be liberally construed to serve and protect the interests and welfare of the child." The Legislature's recognition of the importance of the proceedings to the child is shown by its enactment of Civil Code section 238 providing that the results of the action are conclusively binding upon the child. The Legislature's recognition of the significance of counsel to the protection of the child is disclosed by the reference in Civil Code section 237.5 to the child's "right" to counsel.

"'Liberal construction of Civil Code section 232 et seq. to serve and protect the interests and welfare of the child requires that the burden of persuasion with respect to the trial court's determination to appoint or deny the child independent counsel be placed upon justifying the decision to deny counsel. Unless the burden is allocated in that fashion, *there may well be no one involved, except in an adversary position, in the proceedings to assert the right of a child too young to assert it for himself.* If the right is not asserted, the child's right of personality, recognized as the primary consideration of the process, may be determined without the protection of counsel uninfluenced by his advocate's duty to another party.' [Citation; italics added.]" (*In re Richard E., supra*, 21 Cal.3d 349, 359-360 (dis. opn. of Bird, C. J.).)

■ Finally, the trial court must, before taking away the fundamental civil rights vested in both mother and children to continued familial integrity, consider less drastic alternatives to total severance or increasing continued foster care at the same time preserving the mother's visitation rights is a viable alternative here. Discretion exercised without consideration of "child protective services" or other potentially viable al-

ternatives fails to accord due deference to the fundamental nature of familial autonomy. (*In re Carmaleta B., supra*, 21 Cal.3d 482, 489.)

A good faith effort must be made by the county welfare department to provide social services to supplement or "substitute for, parental care and supervision" before the trial court may permanently sever the parental relationship. (*In re David B., supra*, 91 Cal.App.3d 184, 198; *In re Susan M., supra*, 53 Cal.App.3d 300, 310-313; *In re Rose G.* (1976) 57 Cal.App.3d 406, 422-423 [129 Cal.Rptr. 338].)

For each of the foregoing reasons, the order is reversed.

Wiener, J., and Greer, J.,* concurred.

A petition for a rehearing was denied June 16, 1980, and respondent's petition for a hearing by the Supreme Court was denied August 13, 1980.

---

*Assigned by the Chairperson of the Judicial Council.