[Civ. No. 23295. Third Dist. Nov. 27, 1985.]

IN RE CHRISTINA P., a Minor.
DAVID ZIPF et al., Petitioners and Respondents, v.
PATRICIA P. et al., Objectors and Appellants.

COUNSEL

Carl A. Knutson and Frank O. Bell, Jr., State Public Defender, under appointments by the Court of Appeal, and Antonia D. Radillo, Deputy State Public Defender, for Objectors and Appellants.

Sol S. Judson, Fredric L. Webster and Judson, Webster & Judson for Petitioners and Respondents.

OPINION

BLEASE, J.—Patricia P. and Otis P. appeal from a judgment under Civil Code section 232 declaring Christina P. free from their custody and control.

They contend that the lack of a court reporter at the hearing on the petition for termination of parental custody and control is error that deprived them of appellate review. We will reverse the judgment.

*Facts and Procedural Background:*
*The Petition and the Associated Report*
*of the Probation Officer*

The petition to terminate parental rights was filed on March 1, 1983. The petitioners are Cathleen and David Zipf, who had been Christina's foster parents for two years at the time the petition was filed. The foster parents reside in Lassen County, where the petition was filed. Patricia and Otis P. (the Ps) reside in Contra Costa County.

The foster parents' petition alleges five grounds to warrant termination of parental rights. These grounds are assertions that the criteria for termination in Civil Code section 232, subdivisions (a)(1), (a)(2), (a)(3), (a)(4), and (a)(7) respectively are met.[1] Each assertion is set forth in language borrowed from the statute as an ultimate conclusion of law and fact. Since the hearing conducted concerning the petition was not reported the only thing in the record that fleshes out the terse allegations of the petition is the investigative report of the probation officer prepared for the court in the termination proceeding under Civil Code section 233.

The investigative report states that both the foster parents and the Ps were interviewed. The Zipf home was inspected and found to provide "a loving, happy, secure, comfortable atmosphere with lots of extra homey touches, such as handwork, decorations, and the aroma of freshly baked cookies." The Contra Costa County social worker assigned to Christina P's dependency case told the probation officer that it would be detrimental to Christina to remove her from the foster parents' home because of "strong bonding" and lack of a relationship with the Ps. The social worker said she is not optimistic about the Ps' potential as parents as she doubts they have the ability to develop "essential parenting skills."

The probation officer reported that: "The [Ps] blame social workers and the system for their lack of relationship with their daughter. In their opinion, the child should have been moved to Contra Costa County when they moved there. They expressed no consideration as to how this might have affected the child other than it would have enhanced their relationship with her be-

---

[1]All references to section 232 and its subdivisions are to the version of the statute (Stats. 1982, ch. 978, § 1.) in effect at the time of the proceedings in the trial court unless otherwise stated.

cause they feel they could have visited her more frequently. They express no doubts that they will eventually be granted custody of their daughter. According to Mrs. [P.], 'It is just going to be a lot harder on Christina when we do get custody of her (because the case was not transferred).' "

The probation officer recommended that the Zipfs' petition be granted.

The events which led up to this section 232 proceeding are related in an attachment to the probation officer's report. The attachment is a periodic report prepared by the social worker under Welfare and Institutions Code section 365 for a contemporaneous dependency status review by the Contra Costa County Juvenile Court. The account of Christina P.'s dependency case contained in the report is set forth below, amplified with information from the other documents contained in the record.

### The History of the Wardship of Christina P.

Christina was born September 5, 1980, in Richmond, California. Her father, Otis P., was incarcerated at the California Correctional Center at Susanville at the time of her birth. Otis had been convicted of sexually molesting a 13-year old female. His state summary criminal history information (see Pen. Code, § 11105), commonly known as a rap sheet, indicates that a long and varied history of misdemeanor convictions preceded this incarceration.

Soon after Christina's birth, Patricia P. moved to Susanville with Christina and her sister Kelly, who is approximately a year and one half older than Christina. Inferably, the move was made to enable regular visitation with her incarcerated spouse. On December 30, 1980, Christina was hospitalized for gastro-enteritis with moderate to severe dehydration and possible septicemia. On February 2, 1981, Patricia P., after meeting Christina's doctor in a chance encounter on the street, told him that Christina was ill. He said to bring the child to his office. Patricia P. did so and the doctor decided to admit Christina to the hospital for brocholitis bronchopneumonia with symptoms of high fever, wheezing, and mild to moderate respiratory distress. Apparently Patricia P. was reluctant to agree to the hospital admission.

Prior to February 2, there had been "numerous referrals to the Child Protective Services in Lassen County regarding the care of Christina and the physical conditions in the home." Social workers who made a home visit to Patricia P.'s house on February 2 reported they found "a filthy home, spoiled food, curdled milk in the baby bottle and other [unspecified] conditions indicating neglect."

On February 4, 1981, a petition was filed in the Lassen County Juvenile Court to have Christina adjudged a dependent child of the court. On February 17, 1981, the jurisdictional hearing was conducted and Christina was adjudged a dependent child under Welfare and Institutions Code section 300, subdivision (a). On March 3, 1981, a dispositional hearing was conducted and Christina was placed in the foster care of the Zipfs. Christina's older sister, Kelly P., then age 2, was not removed from her mother's custody.

Patricia P. soon moved back to Contra Costa County. Shortly after arrival there was a complaint made to Contra Costa County Protective Services concerning an altercation between Patricia P. and her father which "reportedly involved a physical struggle over a loaded shotgun, in the presence of Kelly. There was also lack of cooperation [unspecified] regarding Kelly's medical care." For reasons not stated in the record, on March 13, 1981, a petition was filed to adjudge Kelly a dependent child of the Contra Costa County Superior Court. Kelly became a ward but the placement was in the home of Patricia P. who was to be provided intensive follow-up counseling.

In August 1981 at Patricia P.'s insistence, jurisdiction of the wardship of Christina P. was transferred to Contra Costa County. However, on the recommendation of the social worker, the foster care placement with the Zipfs in Lassen County was continued. The social worker viewed the decision concerning shifting foster care placement as a difficult one. If Christina were moved she would be closer to her mother and visitation would be facilitated. However, Christina was "thriving" in the home of the Zipfs and might experience emotional trauma if moved. Patricia P. was experiencing difficulty in parenting Kelly. The social worker doubted that Patricia P. would ever regain custody of Christina and opted for the recommendation that Christina remain with the Zipfs. A periodic status review was set for December 1981.

Dependency status was ordered continued after the December status review. The grounds for continuation were: "Mrs. [P] had been living with people who were arrested for drug usage and also in residence was a four foot python. That Mrs. [P] would reside, with her young daughter, Kelly, in such an environment, was felt to show poor judgment on her part. In addition, Protective Services had received additional complaints about the home's uncleanliness. Another observation that [the social worker] had, was that at times [Patricia P.] was very rough in her handling of Kelly. [The social worker] also heard her threatening to use a belt on Kelly."

The next status review was set for June 1982. At the hearing the social worker noted that in March 1982 Patricia P. had started to show "some

minimal progress." "[I]t appeared that she was learning to be much less passive, and somewhat more assertive." Nonetheless, dependency was continued on the following grounds: "Social service was delighted to see evidence of ability to change in Mrs. P[]. However, Mr. P[] was discharged from prison on about May 27, 1982 and rejoined the family. The effect of this on the family was unknown. There was also some concern as Mrs. P[] had said at varying times that she thought she and Mr. P[] might split up when he was out of prison. [¶] During this period of time, both Protective Services and Placement Services social workers felt that Mr. P[], from his time of release from prison to the June 15, 1982, Court hearing was not cooperative with Social Service. He did not show up for scheduled appointments." [¶] "Therefore, a three month extension was given, with Christina to remain in foster care with the Zipfs, to give Mr. P[] a chance to involve himself in counseling. The Referee specifically made a point of this at the Hearing in June of 1982."

At the next status hearing in September 1982 the Ps fared no better. "[T]here was a new factor added, in that the foster parents had retained an attorney, feeling that they are the de facto and psychological parents of Christina. They were expressing a desire to adopt Christina. In addition, Mr. P[] had not become meaningfully involved in counseling and seemed to be re-involving with Mrs. P[]'s family of origin, a relationship that had been turbulent and detrimental in the past. At this review, the Court recalled clearly how it had been stressed to Mr. P[] in Court that he be involved in counseling. The Court expressed the opinion that Mr. P[], by not getting involved in counseling, showed non-cooperation. The case was therefore continued for six months and it was specifically ordered that the parents be involved in a program of counseling as approved by Social Service."

The next status review was to have been in March 1983. In the interim the social worker noted: "In October 1982, Mr. and Mrs. P[] moved to Richmond and rented a house. This dwelling was much nicer than any Mrs. P[] had resided in during the time [the social worker had] known her. A home visit revealed a clean and presentable home. Also, both mother and Kelly appeared clean and appropriate. Mrs. P[] assured me that she and her husband were seeing [their counselor] regularly." The social worker thereafter sent a letter to the Ps in November 1982 informing them that they would be expected to engage in ongoing counseling, preferably weekly but stating that a minimum of one session every other week would be acceptable. The letter also suggested that the department would like to see "at least monthly visits to Christina." A request to bring Christina to the Ps' home for the week prior to Christmas was refused with the observation "Christina does not know you, and talking with her on the phone does not assist her in building a relationship."

The social worker's report for the next status review in March is the document from which this history has been extracted. In addition to the foregoing history it contains a recommendation of continuation of the wardship. The social worker noted the Zipfs had begun this termination of parental rights proceeding and that this matter was pending. In her view the Ps had not complied with the required counseling program. She attached a letter dated February 15, 1983, from the assigned counselor which reads:

"[Mrs. P.] attended my Parenting Training Class. (10 sessions)" [¶] "She also attended my Parenting Support Group for over a year and had 6 months private counseling with me." [¶] "I have seen Mr. and Mrs. P[] together 4 times for family counseling. They tell me they are planning to continue on an every other week basis now that they have a dependable car and the weather is better. [¶] "[Mrs. P.] continues to mature and Otis seems very sincere in wanting to have his family reunited and to provide a stable home for [Mrs. P.] and the girls."

The social worker opined that this revealed a "one-third compliance" with the counseling requirements.

The social worker suggested two other reasons for continuation of wardship. The first was concern about visitation of Christina by the Ps. The Ps had made three trips to Lassen County to see Christina, in June and December of 1982 and February 1983. On the December visit they brought Christina's grandmother despite instructions from the social worker to limit their party to themselves and Kelly. The Zipfs told the social worker that: the grandmother appeared intoxicated; that Otis P. smelled of alcohol; and that Mrs. P. and Kelly appeared dirty. When Mrs. Zipf told Mrs. P. that Christina was almost potty trained, Mrs. P. said that when Christina was returned to her care she would put her back in diapers.

On the February visit the Ps again brought unauthorized relatives. Mrs. Zipf reported that when Christina returned from a four hour sojourn with the Ps she behaved oddly, clinging to Mrs. Zipf and crying for her bottle. Mrs. Zipf reported that Christina continues to cry a lot and is very possessive of her. There is a scribbled note in the probation report ostensibly prepared by a physician which relates that Mrs. Zipf brought Christina to see him a couple of days after she was returned from a visit with the Ps. The note is largely illegible, however, it does appear to say that the doctor observed "marked redness in vulva area" and that Christina told him "Otis hurt her in bottom." This cryptic innuendo is not mentioned in the social worker's status report or the probation officer's report.

The final reason for continuance of dependency urged by the social worker was the Ps' perceived insensitivity to the trauma that would be inflicted

upon Christina in the loss of her foster home. While Mrs. P. appeared to have gone through "real grieving over her loss of Christina," the social worker opined that the Ps lacked awareness and sensitivity to Christina's position. In her view this could create serious emotional detriment for Christina. Accordingly, she recommended continuance of wardship, pending the outcome of this termination proceeding, despite the "forward strides in [the] lifestyle" of Mr. and Mrs. P. and their desire to have Christina returned to them.

### Events Subsequent to the Filing of the Petition

On July 22, 1983, the probation officer filed a supplemental report stating that Otis P. had been arrested in May 1983 and was charged with violations of Penal Code sections 12021 (ex-felon in possession of a firearm), 12025 (carrying a concealed weapon without a license), and also with drunk driving with a prior conviction. The disposition of the charges is not of record, however, Otis P. was incarcerated at the California Medical Facility at Vacaville at the time of the hearing on the petition in this matter.

### The Proceedings Below

Prior to the hearing separate counsel were appointed to represent Patricia P. and Otis P. A request to appoint counsel to represent Christina P. was denied. The hearing on the petition commenced at 1:30 p.m. on August 19, 1983. The probation officer, Cathleen Zipf, and Cynthia Hatch (a friend of the Zipfs who was present during portions of two visits by the Ps to Christina) testified for the petitioners. Otis P. and Patricia P. testified on their own behalf. The minute order reflects that after the testimony and argument was completed on the afternoon that the hearing commenced: "COURT ORDERS that in the best interests of the child Christina [P.], the Petition to declare minor free from parental custody and control is granted."

On August 23, 1983, Otis P. filed a request for a statement of decision. On August 30, 1983, the trial court by minute order denied the request on the ground that the matter had been completed in one day and no request for a statement of decision was made prior to submission of the cause for decision.

### Discussion

### I

The Ps contend that the absence of a reporter's transcript compels reversal of the judgment for retrial.[2] They posit a trial court duty to insure the

---

[2]Their brief on appeal contains a declaration by Patricia P.'s trial counsel in which he

presence of a court reporter in all Civil Code section 232 proceedings, with new trial a mandatory consequence of breach. They derive the duty by analogy to Welfare and Institutions Code section 347[3] which pertains to proceedings for temporary deprivation of parental custody and control, arising under Welfare and Institutions Code section 300. The Ps reason that section 232 proceedings automatically imbibe the full panoply of procedural devices protective of parent's rights that pertain to the less onerous section 300 proceedings.[4] We need not reach the questions presented by this sweeping claim as we discern a narrower included ground for disposition of the appeal. As appears, we view the failure of the Ps' appointed trial counsel to summon a court reporter as error in the nature of ineffective assistance of counsel which in the circumstances of this case warrants reversal.

■ The initial question is: does ineffective assistance of counsel at a section 232 hearing present a cognizable claim of error on appeal? We have found no case law holding on this precise question. However, we note that in *In re Angelia P.* (1981) 28 Cal.3d 908, 926 [171 Cal.Rptr. 637, 623

---

avers that he does not recall the testimony of the witnesses at the section 232 hearing and did not save any notes he may have made at the hearing. The Ps submit this lack of recollection precludes resort to settled statement or agreed statement procedures. (C.f. *In re Steven B.* (1979) 25 Cal.3d 1, 7 [157 Cal.Rptr. 510, 598 P.2d 480].)

[3]Section 347 states: "At any juvenile court hearing conducted by a juvenile court judge, an official court reporter shall, and at any such hearing conducted by a juvenile court referee, the official reporter, as directed by the court, may take down in shorthand all the testimony and all of the statements and remarks of the judge and all persons appearing at the hearing; and, if directed by the judge, or requested by the person on whose behalf the petition was brought, or by his parent or legal guardian, or the attorneys of such persons, he must, within such reasonable time after the hearing of the petition as the court may designate, write out the same or such specific portions thereof as may be requested in plain and legible longhand or by typewriter or other printing machine and certify to the same as being correctly reported and transcribed, and when directed by the court, file the same with the clerk of the court. Unless otherwise directed by the judge, the costs of writing out and transcribing all or any portion of the reporter's shorthand notes shall be paid in advance at the rates fixed for transcriptions in a civil action by the person requesting the same."

[4]The Ps' argument seeks to apply case law under Welfare and Institutions Code section 677 concerning mandatory new trial where there is no reporter's transcript. (See *In re Steven B.*, *supra*, 25 Cal.3d 1, reporter's notes inadvertently destroyed; *In re David T.* (1976) 55 Cal.App.3d 798 [127 Cal.Rptr. 729], failure of court to appoint court reporter; *In re Andrew M.* (1977) 74 Cal.App.3d 295 [141 Cal.Rptr. 350], failure of court reporter to take down arguments of counsel.) Welfare and Institutions Code section 347 is identical to section 677. The Ps plausibly assert that the rule in *Steven B.* et al. would apply to Welfare and Institutions Code section 300 proceedings. They then seek to import the rule into section 232 proceedings via the rationale of *In re Jacqueline H.* (1978) 21 Cal.3d 170 [145 Cal.Rptr. 548, 577 P.2d 683] and *Crespo v. Superior Court* (1974) 41 Cal.App.3d 115 [115 Cal.Rptr. 681], i.e. that construction of statutes pertaining to section 232 proceedings is informed by procedural devices available in section 300 proceedings. The argument presents troublesome questions because, unlike *Jacqueline H.* and *Crespo,* the result of a borrowing here would not be prospective in effect but would undo judgments. Moreover, the absence of a mandatory court reporter statute associated with section 232 renders the analogy to *Steven B.* et al. less fair because here there was no notice by statute to the trial court that the absence of a court reporter could mar the judgment.

P.2d 198] the Supreme Court addressed an appellate claim of ineffective assistance of counsel at a section 232 proceeding without pausing to consider if it were cognizable. In *Lassiter* v. *Department of Social Services* (1981) 452 U.S. 18 [68 L.Ed.2d 640, 101 S.Ct. 2153], the United States Supreme Court held that a federal constitutional due process right to appointment of counsel for parents at a 232 hearing on termination of parental rights is a question for case-by-case resolution. The federal due process right is dependent upon the complexity of issues likely to be presented and the likelihood that assistance of counsel for the parent might sway the outcome.[5] (*Id.*, at pp. 32-34 [68 L.Ed.2d at pp. 652-654].) In this case we find the Ps' entitlement to assistance of counsel at trial was of constitutional stature under the *Lassiter criteria. When an indigent is entitled to counsel on due process grounds the entitlement must extend to effective assistance of counsel or it will be a hollow right. (See Chevalier* v. *Dubin* (1980) 104 Cal.App.3d 975, 979 [164 Cal.Rptr. 118].) Accordingly, we hold that here ineffective assistance of counsel is a cognizable claim of error.

## II

The next question is what must be shown to prevail on a claim of ineffective assistance of counsel? The first criterion for a successful claim on appeal is a showing that trial counsel " 'failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates.' " (Cf. *People* v. *Fosselman* (1983) 33 Cal.3d 572, 581-582 [189 Cal.Rptr. 855, 659 P.2d 1144].)

Court reporters for civil proceedings function on a demand basis. "The official reporter of a superior court, or any of them, where there are two or more, must, at the request of either party, or of the court in a civil action or proceeding . . . take down in shorthand all the testimony, the objections made, the rulings of the court, the exceptions taken . . . ." (Code Civ. Proc., § 269.) When counsel has reason to anticipate that what is said at a hearing may be pertinent to a subsequent appeal he has a duty to insure that a court reporter is present. (See, e.g., 1 Cal. Civil Procedure During Trial (Cont.Ed.Bar 1982) §§ 11.11-11.12.) Failure to attend to this duty can be tantamount to a waiver of the right to appeal. (See e.g. 6 Witkin, Cal. Procedure (2d ed. 1971) §§ 240, 399, 400.) But waiver of right to appeal is a matter calling for the personal decision of the client and not consigned to counsel. (See 1 Witkin, Cal.Procedure (3d ed. 1985) Attorneys, §§ 201-202.) Where the matter is as grave as termination of

---

[5]We imply no view on the question whether any due process right to appointed counsel for indigent parents in section 232 proceedings that may derive from article I, section 7, subdivision (a) of the California Constitution may be more expansive than the federal right under *Lassiter.*

parental rights and where the client is an indigent person entitled to a free transcript and a free lawyer on appeal, there is no conceivable rational tactical purpose for trial counsel's failure to insure the attendance of a court reporter. Accordingly, the Ps' claim satisfies the threshold criterion applied to criminal cases for appellate pursuit of an ineffective assistance of counsel claim. (Cf., e.g., *People* v. *Fosselman, supra,* 33 Cal.3d at pp. 581-582.) ■ The remaining criterion is that the shortcoming of counsel must be shown likely to have been prejudicial. (See Cal. Const., art. VI, § 13.)

Preliminarily we must address the standard of prejudice. ■ In the criminal law, a lapse by counsel is deemed prejudicial if it deprives the defendant of a potentially meritorious defense or if it is reasonably probable that a determination more favorable to the defendant would have resulted but for counsel's failings. (*Fosselman, supra,* at pp. 581, 584.) We express no view whether this standard should be applied to civil cases in which ineffective assistance of counsel is a cognizable claim. ■ The neglect here was a failure to make an adequate record for appeal. The Ps' paramount claim of disadvantage flowing from the absence of a transcript is loss of the ability to show there is insufficient evidence to support the judgment. Such a contention impugns the very core of the judgment and if lost by counsel's negligence is the epitome of prejudice. We hold that where there is no reporter's transcript of a section 232 hearing and the clerk's transcript reveals a substantial likelihood that there is insufficient evidence to warrant granting the petition reversal is compelled.

### III

The foster parents join issue with the Ps' insufficiency-of-evidence claim and argue that the probation officer's report provides an assurance that there was sufficient evidence to support the judgment. We disagree. ■ ■ ■ ■ ■ Assuming arguendo that the statements set forth in the probation officer's report and its attachments were properly admitted into evidence at the hearing, we could not uphold a judgment of termination in this case.[6]

---

[6]Whether these facts were properly admitted is also rendered opaque by the absence of a reporter's transcript. The minute order reveals that counsel for Patricia P. objected to introduction of the documents attached to the probation officer's report. This includes the Contra Costa County social worker's report which contains the vast bulk of the pertinent evidentiary matter. The probation officer's report is admissible over a general hearsay objection so long as a meaningful opportunity to cross-examine and to controvert the content of the report is afforded. (See e.g., *In re Angelia P., supra,* 28 Cal.3d at p. 926.) Ordinarily, it might suffice to find a meaningful opportunity to cross-examine a witness whose statements are introduced indirectly through a probation report in the ability to subpena that witness to attend the hearing. Failure to subpoena the witness could thus be viewed as a waiver of the right to object. But where a section 232 petition is based in part upon subdivision (a)(7) of the statute the probation officer or social worker responsible for providing reunification

As related, the foster parents' petition sets forth five bases for termination of parental custody and control which parrot five subdivisions of former section 232 (Stats. 1982, ch. 978, § 1, hereafter § 232). Since the trial court declined to issue a statement of decision we are constrained to examine each potential ground.[8] We will do so in the order of occurrence in the statute, seriatum.

## A. Abandonment

The first potential ground urged in the petition is abandonment under section 232, subdivision (a)(1). This provision reads in pertinent part that abandonment occurs when the child: "has been left by both of his parents or his sole parent in the care and custody of another for a period of six months . . . without any provision for the child's support, or without communication from the parent or parents, with the intent on the part of the parent or parents to abandon the child." The controlling issue for a finding of abandonment is the subjective intention of the parent. (*In re Jack H.* (1980) 106 Cal.App.3d 257, 265 [165 Cal.Rptr. 646].) It is possible to sustain such an inference even though the initial "leaving" of the child has been involuntary, i.e. where it has been occasioned by a judicial taking. (*In re Jacqueline H.* (1979) 94 Cal.App.3d 808, 815-816 [156 Cal.Rptr. 765], no visits for a year, no holiday greetings, refusal to seek psychiatric help, no significant efforts to regain custody.) However, it is not possible to infer an intent to abandon in this case based upon the information in the probation officer's report. Mrs. P., to all appearances, never wavered in her efforts to regain custody. The fact that there were only three visits of record in the year prior to the filing of the petition does not permit an inference of intended abandonment in view of these unflagging efforts to regain custody

---

services must appear at the hearing. (See fn. 8, *post.*) However, the minute order pertaining to the hearing on the petition lists the witnesses who testified and the Contra Costa social worker is not among them. Whether this failure of mandatory appearance would require reversal of a judgment obtained under this provision of the statute is a question we need not reach. It is a shortcoming that certainly will be remedied if the matter is retried.

[7]In this respect the petition is gravely deficient and would be vulnerable to attack had an objection been tendered. (*In re Jeremy C.* (1980) 109 Cal.App.3d 384, 397 [167 Cal.Rptr. 283].) No such objection is of record; in the absence of a reporter's transcript we cannot discern whether this was another instance of neglect by the Ps' trial counsel.

[8]At this juncture we note that the lack of a reporter's transcript prevents review of compliance with the duty of the trial court to render a finding of detriment to the child if termination of parental custody is granted. (See Civ. Code, § 4600.) The only finding of record is that granting the petition is in the best interests of the child. This is not a sufficient finding to permit granting the petition. (See *In re B.G.* (1974) 11 Cal.3d 679, 698-699 [114 Cal.Rptr. 444, 523 P.2d 244].) Oral statements disclosing the nature of detriment found that are made by the trial court at the time of rendition of the decision on the petition can suffice to meet the finding requirement. (*In re Richard E.* (1978) 21 Cal.3d 349, 356-357 [146 Cal.Rptr. 604, 579 P.2d 495].) However, there is no record of any such statements here.

and the great distance between the situs of the foster-care home and that of the parents.

## B. Neglect

■ The second potential ground urged in the petition is neglect under section 232, subdivision (a)(2). This subdivision provides for a termination finding concerning a child: "Who has been cruelly treated or neglected by either or both of the child's parents, if the person has been a dependent child of the juvenile court, and the parent or parents have been deprived of the child's custody for the period of one year prior to the filing of a petition praying that the child be declared free from the custody and control of such cruel or neglectful parent or parents." The foster parents rely upon the statement in the status report of the social worker: "On February 17, 1981, Christina P[] was declared a Dependent Child of the Lassen County Juvenile Court as it was found that "the home is unfit due to neglect by the parent in whose custody she was in." This ambiguous assertion is insufficient to provide the showing of neglect required for termination.

■ The inference that the portion of the sentence inside the quotation marks in the report is a quoted finding of the juvenile court is dispelled by the repeated assertion elsewhere in the same report that the dependency finding was rendered under Welfare and Institutions Code section 300, subdivision (a). Dependency invoked under this subdivision is not an adequate basis for granting a section 232 petition for neglect. "Neglect under section 232 embraces a more narrow definition than grounds for declaring dependency. This provision becomes relevant for declaring a minor free from custody and control in situations where the child was found to be dependent *because of cruel or neglectful conduct of parents* under Welfare and Institutions Code section 600, subdivision (d) (now § 300, subd. (d)). (*In re T. M. R., supra,* 41 Cal.App.3d 694, 700 [116 Cal.Rptr. 292].) Neither financial inability to provide necessities nor a less than ideal home environment are of themselves coextensive with the culpable neglect necessary to sever all familial ties." (*In re Jack H., supra,* 106 Cal.App.3d at p. 266.) Nor do the ancillary details of the events leading up to the filing of the original dependency petition in this case reveal such culpable neglect. This simply does not rise to the requisite level of misconduct tantamount to a repudiation of parental status. "The parent-child relationship should be permanently severed only when there has been demonstrable extreme cases of neglect. (See *In re Carmaleta B., supra,* 21 Cal.3d 482, 489 [146 Cal.Rptr. 623, 579 P.2d 514]; *In re D. L. C.* (1976) 54 Cal.App.3d 840 [126 Cal.Rptr. 863]; *In re Susan M., supra,* 53 Cal.App.3d 300 [125 Cal.Rptr. 707]; *In re Halamuda* (1948) 85 Cal.App.2d 219 [192 P.2d 781].) ■ A state act is arbitrary and capricious if it permanently deprived the parent

of the fundamental liberty of raising a family for mere neglect under Civil Code section 232, subdivisions (a)(2) or (a)(7). In like manner, interference with the fundamental liberty of a child to be raised by his or her parents cannot constitutionally be countenanced by a mere showing of neglect. To permit intervention for mere neglect would be to permit the state to interfere with impunity in the affairs of any family. (See *In re B. G.* (1974) 11 Cal.3d 679, 694 [114 Cal.Rptr. 444, 523 P.2d 244].)" (*In re Jack H.*, *supra*, 106 Cal.App.3d at p. 267.)

### C. Moral Depravity

The third potential ground set forth in the petition is moral depravity. Section 232, subdivision (a)(3) provides for termination of parental rights, inter alia, when a child's parents "are morally depraved, if the person has been a dependent child of the juvenile court, and the parent or parents have been deprived of the child's custody because of . . . moral depravity, for the period of one year continuously immediately prior to the filing of the petition . . . ." (*Ibid.*) There is nothing in the probation officer's report which supports a finding under this provision.

### D. Conviction of a Felony Which Proves Unfitness

The fourth ground set forth in the petition is that Otis P. has been convicted of a felony which proves he is unfit to have future custody and control of Christina. Section 232, subdivision (a)(4) permits termination of parental rights over a child "[w]hose parent or parents are convicted of a felony, if the facts of the crime of which the parent or parents were convicted are of a nature so as to prove the unfitness of the parent or parents to have the future custody and control of the child." Otis P., in answering the petition, admitted that he had been convicted of a felony but denied that the conviction proved unfitness. There are two sources of evidence concerning the facts of the unspecified felony conviction that are contained in the probation officer's report. One is a rap sheet for Otis P. The other is the narrative report of the social worker. The sole pertinent item in that report is the statement that the offense for which Otis P. was incarcerated at Susanville was the sexual molestation of a 13-year-old girl.

To sustain a finding under section 232, subdivision (a)(4), the evidence must show a felony which proves the unfitness of the felon-parent. Unfitness means a probability that the parent will fail in a substantial degree to discharge parental duties toward the child. (See *O'Brien* v. *O'Brien* (1968) 259 Cal.App.2d 418, 422-423 [66 Cal.Rptr. 424]; *Guardianship of Willis* (1954) 123 Cal.App.2d 446, 450-451 [266 P.2d 944].) Clear and convincing evidence of such a probability means evidence " ' " "so clear as to leave no

substantial doubt"; "sufficiently strong to command the unhesitating assent of every reasonable mind." ' " (See *In re Angelia P., supra,* 28 Cal.3d at p. 919.) Such a showing cannot be predicated upon the rap sheet here which only reveals a list of Penal Code sections of which Otis P. has been convicted of violating.

■■■ The only felonies in the list of dispositions on the rap sheet are a 1969 conviction of violation of Penal Code section 4532, subdivision (a), escape without use of force, and a 1980 conviction of violation of former Penal Code section 288 (Stats. 1978, ch. 579, § 17), lewd or lascivious act upon or with the body of a child under the age of 14 years. To disqualify a parent under section 232, subdivision (a)(4) a felony not involving the child in issue must be one which unambiguously shows depravity of the parent sufficient to support the conclusion he or she will probably fail to discharge parental duties toward the child. (See *In re James M.* (1976) 65 Cal.App.3d 254, 265 [135 Cal.Rptr. 222].) The bare fact of conviction of a crime as heinous as murder does not show such depravity. (*Ibid.*) The bare listing of convictions on the rap sheet in this case should not be deemed substantial evidence of such depravity.

Amplification of facts concerning the sexual molestation incident might permit a sufficiently strong inference that Otis P. is a sexual deviant and likely to be a threat to his daughters. Amplification of the facts of the totality of the convictions of Otis P. could disclose a criminal propensity whose pattern permits an inference that he will be incarcerated for protracted periods in the future with a resultant substantial breach of parental duties. (Compare *Adoption of D.S.C.* (1979) 93 Cal.App.3d 14, 24-26 [155 Cal.Rptr. 406].) However, in view of the level of proof required in a termination proceeding, the rap sheet of Otis P. is not in and of itself substantial evidence of a felony whose facts warrant termination under section 232, subdivision (a)(4).

■■■ Moreover, even if a termination finding under section 232, subdivision (a)(4) would have been proper as against Otis P. this could not be the predicate for termination of the parental rights of Patricia P. Termination findings under section 232 may run against either or both parents. (See Civ. Code, §§ 232, subd. (a), 239; c.f. *In re Angelia P., supra,* 28 Cal.3d at p. 925.) There is no indication that Patricia P. has had any culpable involvement in the felonious conduct of Otis P. Absent such an indication these felony convictions have no bearing on her fitness to have future custody and control of the child. Accordingly, no termination finding adverse to her under section 232, subdivision (a)(4) could be made premised upon Otis P.'s rap sheet.

### E. Failure to Maintain An Adequate
### Parental Relationship With the Child.

 The remaining ground set forth for termination of parental custody and control is that of section 232, subdivision (a)(7).[9] In order to warrant granting the petition under this provision the evidence must show "that return of the child to the child's parent or parents would be detrimental to the child *and* that the parent or parents have failed during such period, and are likely to fail in the future, to do all of the following: [¶] (i) Provide a home for the child. [¶] (ii) Provide care and control for the child. [¶] (iii) Maintain an adequate parental relationship with the child." (*Ibid.*; italics added.) Here there is insufficient evidence in the facts revealed by the probation officer's report to warrant a finding that the Ps "failed" to maintain an adequate parental relationship and are likely to fail to do so in the future.

Section 232, subdivision (a)(7) was discussed by the Supreme Court in *In re Laura F.* (1983) 33 Cal.3d 826 [191 Cal.Rptr. 464, 662 |P.2d 922]. The court explained the operation of the provision: "The children [who were

---

[9]This provision was added to section 232 in 1973. (Stats. 1973, ch. 686, § 1.) Since that time it has frequently been amended by the Legislature. The version in effect when this matter was tried provided in pertinent part for termination of parental rights to a child: "(7) Who has been cared for in one or more foster homes, residential facilities licensed pursuant to Chapter 3 (commencing with Section 1500) of Division 2 of the Health and Safety Code, or health facilities licensed pursuant to Chapter 2 (commencing with Section 1250) of Division 2 of the Health and Safety Code, under the supervision of the juvenile court, the county welfare department or other public or private licensed child-placing agency for 12 months, provided the court finds by clear and convincing evidence that return of the child to the child's parent or parents would be detrimental to the child and that the parent or parents have failed during such period, and are likely to fail in the future, to do all of the following: [¶] (i) Provide a home for the child. [¶] (ii) Provide care and control for the child. [¶] (iii) Maintain an adequate parental relationship with the child.

"The court shall make a determination that reasonable services have been provided or offered to the parents or guardians which were designed to aid the parents or guardians to overcome the problems which led to the deprivation or continued loss of custody and that despite the availability of these services, return of the child to the parents or guardians would be detrimental to the child. Probation officers or social workers who provided these services shall appear at the termination proceedings." (Stats. 1982, ch. 978, § 1.)

The provision presently states in pertinent part: "(7) Who has been in out-of-home placement under the supervision of the juvenile court, the county welfare department, or other public or private licensed child-placing agency for a one-year period, if the court finds that return of the child to the child's parent or parents would be detrimental to the child and that the parent or parents have failed during that period, and are likely to fail in the future, to maintain an adequate parental relationship with the child, which includes providing both a home and care and control for the child.

". . . . . . . . . .

"The court shall make a determination that reasonable services have been provided or offered to the parents which were designed to aid the parents to overcome the problems which led to the deprivation or continued loss of custody and that despite the availability of these services, return of the child to the parents would be detrimental to the child. The probation officer or social worker currently assigned to the case of the child shall appear at the termination proceedings."

the subject of the section 232 proceeding] were declared wards of the juvenile court under subdivision (a) of former section 600 (now § 300) of the Welfare and Institutions Code which provides for wardship of a child whose parents are either incapable or unwilling to exercise effective parental care or control. If the parents' incapacity or unwillingness to provide care or control continues for an extended period of time and there is no indication that they can or will rehabilitate themselves, they become subject to the potential termination of parental rights as provided in subdivision (a)(7) of section 232." (*Id.*, at p. 832; fn. omitted.) Thus, the provision has a probationary aspect. If and only if the parent fails to progress in overcoming the deficiency which provoked the temporary deprivation of custody and control or which *prevented return of the child thereafter may parental ties* be finally severed. "[S]ubdivision (a)(7) focuses on the parent's failures *during* the period of foster care and the likelihood of failure in the future . . . ." (*In re Laura F., supra,* at p. 833.) The provision contains a threat to parents when their children are involuntarily placed in foster care, but it also contains a promise—if they satisfactorily progress toward rehabilitation their parental rights will not be severed.

 Finally, to uphold a termination of parental rights of the mother, Patricia P., there must be clear and convincing evidence that *her* progress as a parent in the year prior to the filing of the petition permits the inference that it is likely she could not maintain an adequate parental relationship with Christina in the future. We do not find substantial evidence in support of such an inference in this record. She had been an active participant in the counseling program suggested by the social welfare authorities; she had upgraded her housekeeping; and been an adequate parent to Christina's sister Kelly. The criminal misconduct of her spouse cannot be held against her without some showing of her involvement in this conduct. Nor can she be held at fault for the recalcitrance of her spouse regarding compliance with the counseling requirements.[10]

The only deficiency articulated concerning Patricia P.'s ability to parent Christina adequately in the future is the suggestion that she is insensitive to the emotional trauma that Christina would likely suffer were she removed from the foster home. However, accepting for the sake of argument that her appreciation of this problem was a danger sufficient to render her inadequate, there is no indication that this deficiency was irremediable with rea-

---

[10]We note that without examination of the social worker as contemplated by section 232, subdivision (a)(7) (see fn. 5, *ante*), there is no means to weigh the gravity of Otis P.'s failure to meet the quantitative standard for counseling. The content of the required "counseling" is opaque on its face. Whether failure to abide by the quantitative requirements is an indication of failure to maintain an adequate parental relationship depends upon the need for and purposes of that requirement.

sonable services offered by the social welfare authorities. (See § 232, subd. (a)(7), *ante*, fn. 8.)

### Conclusion

In summary, none of the grounds proffered as a basis of permanent termination of the P.'s parental rights to custody and control of Christina P. is supported by substantial evidence based upon the facts introduced via the probation officer's report. Accordingly, we conclude that the absence of a reporter's transcript has deprived the Ps of a potentially meritorious claim. This demonstrates that they have been prejudiced by the neglect of their counsel to insure the attendance of a court reporter at the hearing on the petition to terminate parental rights.

The judgment is reversed.

Evans, Acting P. J., and Rodda, J.,* concurred.

A petition for a rehearing was denied December 23, 1985.

---

*Assigned by the Chairperson of the Judicial Council.