[No. D010072. Fourth Dist., Div. One. Mar 28, 1990.]

In re NANETTE M., a Minor.
SAN DIEGO COUNTY DEPARTMENT OF SOCIAL SERVICES,
Petitioner and Respondent, v.
NITA M., Objector and Appellant.

COUNSEL

Robert D. Frank, under appointment by the Court of Appeal, for Objector and Appellant.

Lloyd M. Harmon, Jr., County Counsel, Philip E. Dunn, Jr., Chief Deputy County Counsel, and Patricia L. Davis, Deputy County Counsel, for Petitioner and Respondent.

Pamela M. Slick, under appointment by the Court of Appeal, for Minor.

OPINION

**WIENER, Acting P. J.**—Nita M. appeals from a judgment declaring her daughter Nanette free from her custody and control pursuant to Civil Code section 232, subdivisions (a)(2) and (a)(7).[1] Nita challenges the sufficiency of the evidence as to each of the court's findings. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Nita has two children: a son, Timothy, born in 1979; and a daughter, Nanette, born in 1986. This case involves an adjudication of Nita's right to custody and control of Nanette.[2]

Nita has a history of mental infirmity dating back to the time of her son's birth, although authorities did not learn of her problems until 1984. At that time, she and Timothy were in a shopping mall where a security guard noted scratches about the boy's throat and called police. The officers questioned Timothy and learned Nita had lost control, grabbed him by the throat, and scratched him with her fingernails.

Timothy was taken into protective custody. Upon learning more about the family situation, including the fact that Nita had been diagnosed as schizophrenic, the department of social services (DSS) successfully petitioned to have Timothy declared a dependent of the court. Nita's parents eventually became his legal guardians.

In deciding to remove Timothy from Nita's custody, the court considered a psychological evaluation performed on Nita by Dr. Herbert Hurwitz of

---

[1] All statutory references are to the Civil Code unless otherwise specified. All unparticularized subdivision references are to Civil Code section 232 unless otherwise specified.

[2] Nanette's father is deceased.

the probation department. Dr. Hurwitz found Nita's thought processes were grossly fragmented, rarely enabling her to construct a cohesive sentence. He believed she was suffering from hallucinations and delusions. He opined her prognosis was poor.

Hospital staff became concerned about Nita's odd behavior at Nanette's birth in February 1986. Nita showed no interest in the baby after delivery, and upon being presented with Nanette for feeding, she thought the newborn was seven-year-old Timothy. Following this episode, the DSS initiated dependency proceedings and the court ordered Nanette detained in foster care.

At the dispositional hearing, the court reviewed Nita's psychiatric evaluations and the social worker's recommendations before declaring Nanette a dependent child subject to detention in Nita's home. Nita cared for Nanette under the supervision of the DSS.

A DSS social worker paid an observation visit to Nita's home when Nanette was six months old. While there he witnessed Nita slap Nanette forcefully on the arm after the infant grabbed her hair. Nita's behavior and inappropriate comments caused the social worker to remove Nanette from the home that day. The child was placed in the foster home of Brenda Loundsbury, who eventually became desirous of adopting Nanette.

For the next several months, Nita regularly visited with Nanette in the foster home. Nita undertook a combination of therapy and parenting classes consistent with the proposed reunification plan, although the plan was never ordered by the court. Nita was on medication for the schizophrenia and by early 1987, two evaluating psychiatrists, Dr. Nelson Leone and Dr. Donald Duff, expressed opinions that her condition had improved.

At a regularly scheduled review hearing in March of 1987, a social worker reported Loundsbury had described instances of questionable behavior by Nita during visits with Nanette. Among other things, Loundsbury alleged that Nita had rubbed Nanette's genital area. A similar allegation had previously been made by Nita's mother about her behavior toward Timothy. Loundsbury had further offered that Nita allowed Nanette to touch Nita's genital area on at least one occasion. Nita denied the allegations.

As a result of Loundsbury's continued allegations, the court modified the visitation order to allow Nita one hour of supervised visitation per week outside the foster home. Margaret Brown, a DSS case aide who supervised some of the visits, testified the visits outside the Loundsbury home were always pleasant. Nita and Nanette were invariably joyful at seeing one

another. Conversely, Brown felt based on her observations that Lounds-bury's demeanor toward Nanette was not loving or affectionate. Brown said the child cried at having to leave Nita and was reluctant to exit the car upon arriving back at the Loundsbury home.

In March 1988, despite the acknowledged efforts of Nita to comply with the proposed reunification plan, the county entered a petition to free Nanette from Nita's custody and control. The petition alleged that subdivisions (a)(2), (a)(6) and (a)(7) of section 232 were applicable.[3] Eventually, the court dismissed the subdivision (a)(6) allegation.

In early August of 1988, the court considered the recommendations of Nita's psychologist and probation officer and granted Nita unsupervised visitation with Nanette. According to Loundsbury, Nanette reacted adversely to Nita's visits, in that she was alternately withdrawn and "clingy." Nanette also experienced severe bouts of diarrhea during this period.

A psychologist called upon to evaluate Nanette in August 1988 concluded by the child's behavior that she had possibly been sexually molested. Late in August, Loundsbury recorded a videotape of Nanette in the bathtub. In it Loundsbury asked the child, "Where did Nita touch you?" Nanette responded by pointing to her genital area. The DSS and others interpreted a portion of the tape as depicting Nanette in the act of masturbation, a

---

[3] The pertinent portions of section 232 state that, "(a)    An action may be brought for the purpose of having any child under the age of 18 years declared free from the custody and control of either or both of his or her parents when the child comes within any of the following descriptions:

"...    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"(2)    Who has been neglected or cruelly treated by either or both parents, if the child has been a dependent child of the juvenile court under any subdivision of Section 300 of the Welfare and Institutions Code and the parent or parents have been deprived of the child's custody for one year prior to the filing of a petition pursuant to this section. . . .

"...    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"(6)    Whose parent or parents are mentally disabled and are likely to remain so in the foreseeable future. As used in this subdivision, 'mentally disabled' means that a parent or parents suffer any mental incapacity or disorder which renders the parent or parents unable to adequately care for and control the child. The evidence of any two experts, each of whom shall be either a physician and surgeon, certified either by the American Board of Psychiatry and Neurology or under Section 6750 of the Welfare and Institutions Code, or a licensed psychologist who has a doctoral degree in psychology and at least five years of postgraduate experience in the diagnosis and treatment of emotional and mental disorders, shall be required to support a finding under this subdivision. . . .

"(7)    Who has been in out-of-home placement under the supervision of the juvenile court, the county welfare department, or other public or private licensed child-placing agency for a one-year period, if the court finds that return of the child to the child's parent or parents would be detrimental to the child and that the parent or parents have failed during that period, and are likely to fail in the future, to maintain an adequate parental relationship with the child, which includes providing both a home and care and control for the child. . . ."

scene suggesting molestation; however, a child psychiatrist retained by Nita, Dr. Gerald Nelson, reviewed the tape a number of times and believed Nanette's actions in it constituted age-appropriate behavior.

Alarmed by the videotape, the social worker ordered a physical examination of Nanette. The examining physician concluded there was no evidence of molest. Nevertheless, the DSS suspended Nita's visitation rights for a short time, and, upon reinstating them, required that all visits be supervised.

Concern regarding Nanette's foster situation also arose during this time, since Nanette had sustained black eyes and numerous other bruises about her body. Loundsbury attributed these to the child's playful interaction with her foster brothers. Eventually, Nanette broke her leg, and the physician who treated her felt Loundsbury's explanation regarding the source of the bruises was suspicious. Although the Loundsburys had expressed an ongoing desire to adopt Nanette, the child was removed to a new foster home in October of 1988.

The court proceeded to set the trial on the section 232 petition to free Nanette from her mother's custody and control. In January 1989, shortly before the trial, the court terminated Nita's visitation rights, finding that the child had not benefited from visitation and was now in need of stability and permanence in her life.

At trial, the court made findings by clear and convincing evidence that the subdivisions (a)(2) and (a)(7) allegations were true. The court found Nanette had "probably [been] molested." In addition, the court found Nita incapable of adequately caring for Nanette.

## DISCUSSION

The issues Nita raises all regard the sufficiency of the evidence supporting the judgment. ■ Initially we note findings under any subdivision of section 232 must be made on the basis of clear and convincing evidence. (*In re Angelia P.* (1981) 28 Cal.3d 908, 919 [171 Cal.Rptr. 637, 623 P.2d 198].) ■ We must review the record in a light most favorable to the judgment to determine whether it reveals substantial evidence, evidence which is reasonable, credible and of solid value, such that a reasonable trier of fact could find the termination of parental rights appropriate. (*Id.* at p. 924.)

■ Nita first draws our attention to the court's findings of neglect and cruelty under subdivision (a)(2). Her argument that there is insufficient

evidence to support the finding of neglect is plausible, especially in light of our previous holding that "[t]he parent-child relationship should be permanently severed only when there has been demonstrable extreme cases of neglect." (*In re Jack H.* (1980) 106 Cal.App.3d 257, 267 [165 Cal.Rptr. 646].)

Here, the record clearly demonstrates Nita's ongoing interest in Nanette's well-being. Nita regularly visited her daughter and showed admirable parental concern for the infant's health and development. She substantially complied with the proposed reunification plan by seeking therapy and attending parenting classes. Indeed, inasmuch as Nanette has been out of Nita's custody for most of her young life, Nita has had little opportunity to neglect her daughter in the traditional sense of failing to provide for her basic needs. Nor does the record support a finding of emotional neglect, "the deprivation of the emotional stimulus and outward love and affection to which a child is entitled from [her] mother." (*In re Morrow* (1970) 9 Cal.App.3d 39, 57 [88 Cal.Rptr. 142] (disapproved on other grounds in *Hollister Convalescent Hospital, Inc.* v. *Rico* (1975) 15 Cal.3d 660 [125 Cal.Rptr. 757, 542 P.2d 1349]).)

The finding of cruelty is somewhat more complex. The court found Nanette "was probably molested." A review of the record reveals most of the allegations of molest were traceable to the foster mother, Loundsbury, who wished to adopt Nanette but from whose care Nanette was eventually taken under somewhat suspicious circumstances. Recognizing this, the court expressed doubts about Loundsbury's credibility and purported to make its findings without considering her input. It is unclear to us whether this was possible, however, since Loundsbury's allegations served as catalyst for the concerns expressed by Nanette's psychologist, special advocate and the social worker involved. The lack of consensus as to whether the videotape portrayed age-appropriate behavior or masturbation fostered by Nita further calls into question the viability of a cruelty finding based on clear and convincing evidence.

In any event, we need not devote extended analysis to the findings under subdivision (a)(2) since there exists a sufficient basis for the judgment under subdivision (a)(7).

Nita contends the court failed to find the statutorily required present and future inability on her part to care for Nanette. She also urges the evidence would not have supported such a finding. As to the first contention, the court expressly stated "[t]here is no indication in the file that [Nita] is at this time capable of caring for the minor." This statement does not suggest, as she contends, that the court put the onus on Nita to prove herself capable

of parenting rather than properly keeping the burden on the county to prove her incapable by clear and convincing evidence. The trial judge in this case was experienced and well versed in the proper procedure required in these matters. Moreover, the court looked at the county's evidence and noted Nita had been diagnosed as having a thought disorder of several years' duration with no showing of progress. By rendering the judgment it did, the court demonstrated its conclusion that the county proved Nita was and would remain unable to effectively care for Nanette. Since the best indication of one's future ability to parent is found in her history prior to the hearing (*In re Norma M.* (1978) 77 Cal.App.3d 110, 116 [143 Cal.Rptr. 412]), we are satisfied the court reasonably and properly arrived at its determination.

We need only examine, then, the sufficiency of the evidence supporting the findings under subdivision (a)(7). It was undisputed that Nita had attempted to become capable of caring for Nanette. The court recognized these attempts. Nevertheless, the court had before it numerous reports describing the chronic nature of Nita's mental problems, including one from the psychiatrist she had retained. While some of the reports suggested Nita's condition was improving, others indicated that her status had deteriorated. She was variously described in these reports as being "in poor contact with reality" and having "bizarre thoughts" and "absolutely no insight regarding her mental illness." Nita denied the accuracy of the schizophrenia diagnosis and believed continued medication might not be necessary. Despite her professed mental soundness at the time of trial, the court was permitted to find Nita lacked the insight to realize her mental instability continued without significant change. (*In re Shannon W.* (1977) 69 Cal.App.3d 956, 965 [138 Cal.Rptr. 432].)

The trial court is neither able nor required to predict the future with absolute certainty. (*In re Norma M., supra,* 77 Cal.App.3d at p. 116.) Rather, the court is simply called upon to determine the likelihood of the parent's future ability to care for the child. Furthermore, despite Nita's sincere desire to care for Nanette, the court's focus "was not solely on the efforts or fitness of the parent, but, appropriately, upon the detriment to the child." (*In re Solomon L.* (1987) 190 Cal.App.3d 1106, 1113 [236 Cal.Rptr. 2].)

Nita directs our attention to the fact that the court had dismissed the subdivision (a)(6) allegation before trial. She urges it was therefore improper to find the subdivision (a)(7) allegation true based on her mental status. She points to the court's language in *In re Norma M., supra:* "[w]hen subdivision (a)(7) of Civil Code section 232 is read in conjunction with the other subdivision it is clear that each subdivision was drafted to deal with

specific situations and the requirements of the statute cannot be satisfied by shifting some of the elements of one subdivision to another." (*In re Norma M., supra,* 77 Cal.App.3d at p. 115.)

The force of her argument is not lost on us. We cannot conclude, however, that the court here sustained the petition on the basis of language in subdivision (a)(6) while purporting to do so under subdivision (a)(7). Unlike *In re Norma M.,* in which the court discussed the impropriety of sustaining a section 232 petition using the criteria from subdivision (a)(1) along with some from subdivision (a)(7), the case before us involves an allegation under subdivision (a)(7) which was sustainable independent of subdivision (a)(6). The provisions of these subdivisions are not mutually exclusive. Subdivision (a)(7) demands the present and future ability to parent be assessed; the parent's mental health may be a factor in this analysis. Having found all the requirements of subdivision (a)(7) were met, the court was not constrained to proceed under subdivision (a)(6). (See *In re Victoria M.* (1989) 207 Cal.App.3d 1317, 1332 [255 Cal.Rptr. 498].)

After reviewing all the evidence and listening to the testimony, the court here found the case troubling. We are likewise disturbed by the necessity of depriving a parent of the right to raise the daughter she clearly loves. Nevertheless, we are mindful that the best interests of the child are, and must remain, of paramount concern. Because the record reveals sufficient evidence upon which the court sustained the section 232, subdivision (a)(7) allegation, we must affirm the judgment.

## DISPOSITION

The judgment is affirmed.

Benke, J., and Huffman, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 20, 1990.