Filed 5/12/23  Adoption of J.D. CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| Adoption of J.D., a Minor. | 2d Civil No. B323444<br>(Super. Ct. No. T000165)<br>(Ventura County) |
| N.F.,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>C.D.,<br><br>    Defendant and Respondent. | |

N.F. (Mother) appeals a judgment denying her petition to declare her daughter J.D. free from the custody and control of C.D. (Father).  (Fam. Code, § 7822.[1])  The trial court found Father failed to communicate or visit J.D. for more than one year, but he rebutted the presumption of abandonment and Mother

---

[1] All statutory references are to the Family Code.

failed to present clear and convincing evidence that Father intended to abandon his child.  We affirm.

FACTS

Mother and Father are the unmarried parents of J.D., a teenage girl who was born in 2006.  In 2008, they had "shared joint legal custody" of J.D., and Father had "supervised visitation" with J.D.  Mother has had full legal and physical custody of J.D. since 2019.

Z. moved in to live with Mother in 2010.  In 2019, Father filed a request to modify his visitation rights with J.D. to allow him to have "unsupervised visits."  J.D. wanted the visits to "remain supervised."  The family court denied Father's request.

In 2020, Z. married Mother and became J.D.'s stepfather.

On November 1, 2021, Mother filed a petition to terminate Father's parental rights to J.D.  She alleged Father's last visit with J.D. was on August 19, 2019.  She claimed Father "has not tried to contact the minor child for more than a year" and this constitutes an intent to abandon the child.

On February 22, 2022, the Ventura County Human Services Agency (HSA) filed a report with the trial court.  The social worker interviewed Mother, the stepfather, and the child.  J.D. told the social worker, " 'I want to be adopted, [Z., the stepfather] is my dad.' "  HSA did not interview Father.  It recommended that J.D. "be freed to be adopted by the . . . stepfather."

Mother testified Father did not "reach out" to her to ask how J.D. "was doing."  The last message she received from Father was in August 2019.  Mother did not block Father from texting J.D.  She set up "family counselling," but Father did not attend the counselling sessions.  From September 2019 "to now," Father

did not contact her to set up visits with J.D. Mother wanted Father's parental rights with J.D. terminated because he "hasn't been present consistently," he is not "dependable," and Z. "has stepped into the father role" for J.D.

J.D. testified the last time she saw Father was in 2019. Father "completely dropped off the face of the earth in, like, 2019." J.D. did not know why he did that. She was not afraid of Father. She wanted to be adopted by her stepfather. She was asked, "Do you believe that your father has ever stopped loving you?" J.D. said, "I really don't know." She was asked if she loved her father. She responded, "I did. I don't know if I really do anymore."

Father testified he did not intend to abandon J.D. He consistently visited the child in 2016, 2017, and 2018. Mother did not inform him of any counselling schedule for J.D. He stopped contacting the child because she was in the middle of a conflict between the adults. J.D. wanted to communicate with him, but Mother and the stepfather did not want her to text him. Father's text messages to his child were being blocked. He did not want the child "to be filled with unnecessary drama" or stress because of the conflict between the adults. Because the child was facing pressure from Mother and the stepfather, he did not want J.D. "to be put in a bad spot."

Father felt J.D. needed "a little space," and the period of no contact would give her that space. He believed it would be "temporary," and, given time, she "was going to come back" to him. Other factors that prevented him from visiting the child included the pandemic and the stepfather's threatening behavior.

The trial court denied the petition. It found there was a presumption of abandonment because Father had no contact with

3

the child for more than one year.  (§ 7822.)  But Father "rebutted the presumption."  "The facts of this case do not clearly and convincingly demonstrate that Father intended to abandon [J.D.]."

## DISCUSSION

### *Denying Mother's Petition*

Section 7822, subdivision (a)(3), provides, in relevant part, "A proceeding under this part may be brought if . . . :  . . . One parent has left the child in the care and custody of the other parent for a period of one year without any provision for the child's support, or without communication from the parent, with the intent on the part of the parent to abandon the child."  "Accordingly, a section 7822 proceeding to terminate parental rights is appropriate 'where three main elements are met: (1) the child must have been left with another; (2) without provision for support or without communication from the parent for the statutory period; and (3) *with the intent on the part of the parent to abandon the child.*' "  (*In re Aubrey T.* (2020) 48 Cal.App.5th 316, 326, italics added.)  "A trial court's finding of abandonment must 'be supported by clear and convincing evidence.' "  (*Ibid.*)  "On appeal, the reviewing court examines the entire record to determine whether there is substantial evidence to support the trial court's findings."  (*Ibid.*)

The involuntary termination of the parent-child relationship "by state action must be viewed as a drastic remedy which should be resorted to *only in extreme cases of neglect or abandonment.*"  (*In re T.M.R.* (1974) 41 Cal.App.3d 694, 703, italics added.)  Where the parent did not contact the child within the statutory period, but he or she did not intend to abandon the child, termination of the parent's parental rights is not

4

appropriate.  (*Ibid*.; *In re Aubrey T.*, *supra*, 48 Cal.App.5th at p. 326.)

"The failure to provide identification, failure to provide support, or failure to communicate is presumptive evidence of the intent to abandon."  (§ 7822, subd. (b).)  But "the presumptive evidence may be overcome by opposing evidence and the *question of intent to abandon is a question of fact to be decided by the trial court*."  (*In re Bisenius* (1959) 173 Cal.App.2d 518, 522-523, italics added.)  The presumption may be rebutted by evidence showing the parent did not intend to abandon the child, valid reasons existed for not making contact, there was interference with the parent-child relationship by third parties, and the court may consider evidence showing the relationship the parent had developed with the child, or other factors.  (*In re Aubrey T.*, *supra*, 48 Cal.App.5th at p. 329; *In re H.D.* (2019) 35 Cal.App.5th 42, 53; *In re E.M.* (2014) 228 Cal.App.4th 828, 841; *In re Allison H.* (1991) 230 Cal.App.3d 154, 161; *In re Jack H.* (1980) 106 Cal.App.3d 257, 265.)

*Substantial Evidence*

Mother contends the evidence is not sufficient to support the trial court's findings.  We disagree.

Mother cites the evidence she produced and claims it shows Father abandoned the child.  But the issue is not whether some evidence supports appellant, it is only whether substantial evidence supports the judgment. *(Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 874.)

In deciding the sufficiency of the evidence, we must draw all reasonable inferences from the record in support of the judgment.  (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011-1012.)  Mother claims Father's testimony was not credible and

5

the trial court erred by relying on it. But we do not decide the credibility of the witnesses; that is a matter exclusively decided by the trial court. (*Lenk v. Total-Western, Inc.* (2001) 89 Cal.App.4th 959, 968.) She claims the weight of the evidence she presented supports the granting of her petition. But we do not reweigh the evidence. The trial court exclusively decides the weight to be given to the evidence and it resolves evidentiary conflicts. (*Muzquiz v. City of Emeryville* (2000) 79 Cal.App.4th 1106, 1121.) "The testimony of one witness may be sufficient, as against any number of witnesses testifying to the contrary, for the proof of a fact in a civil case." (*Zinn v. Ex-Cell-O Corp.* (1957) 148 Cal.App.2d 56, 70-71; see also *In re Marriage of Slivka* (1986) 183 Cal.App.3d 159, 163.)

Father's testimony supported findings that he did not intend to abandon J.D. during the one-year period and that he had developed a substantial relationship with her. He said he "never stopped trying to be part of her life." He bought her gifts "this year and last year." He bought Christmas and birthday gifts for her. In 2016, 2017, and 2018, he saw J.D. "several times a month." He saw her at "soccer practices" and "softball practices." He would try "to make every practice." His visits involved substantial time. They would last "four to six hours." He financially supported this child by making "regular and consistent payments for child support." (*In re E.M.*, *supra*, 228 Cal.App.4th at p. 840.)

Text messages between Father and J.D. supported his claim that he had developed a substantial relationship with her. The trial court found Father and J.D. "had exchanged loving and appropriate text messages, and there was no indication that [J.D.] was uncomfortable with her father or that she was

6

reluctant to communicate with him." Because J.D. told Father that she wanted to spend more time with him, he filed a modification of visitation motion to have unsupervised visits with her.

But Father was surprised because of J.D.'s sudden change of attitude when she told a mediator that she wanted the visits to remain supervised. Father said Mother and J.D.'s stepfather had pressured her to change her attitude about him.

Father testified there were factors that prevented him from having more visits with J.D. J.D. lived with Mother and her stepfather. On one occasion the stepfather displayed a "concealed firearm" that Father took as a threat to his safety. Father was "intimidated" by the stepfather's threatening conduct. Despite this, he still tried to "communicate directly with [J.D.]." The pandemic also interfered with his ability to visit J.D. He lost his job and had to care for an elderly person.

Father was concerned about the impact on J.D. of contacting her at her home. (*In re Aubrey T.*, *supra*, 48 Cal.App.5th at p. 329 [a parent's reasons for not contacting the child may constitute evidence to rebut the statutory presumption of abandonment].) Here, Father said the child was in the middle of a conflict between Mother and stepfather on one hand, and Father's attempts to contact her on the other.

Father testified J.D. wanted to communicate more with him, but Mother and stepfather did not want her to text him. His text messages to the child were being blocked. J.D. told him that she "gets in trouble" for calling him "without asking" permission. During his calls with her, J.D. would hide the phone to prevent Mother and stepfather from knowing that she was talking with him. She was "being heavily influenced at her home life." Father

7

did not want her "to be filled with unnecessary drama" or stress because of this pressure from the adults. He felt stopping contact with the child for a temporary period would give her "a little space" that she needed to be free from the stress of this conflict. Father believed the child wanted this temporary cessation of contact. He said, "I was waiting for her to reach out." "I just thought that's what [J.D.] wanted." He did not realize that not contacting her to give her "space" would lead to terminating his parental rights, and he did not want that result.

"*Great deference must be given* to the trial court's adjudication of the facts . . . ." (*In re Marriage of Condon* (1998) 62 Cal.App.4th 533, 549, italics added.) The court may consider the parent's subjective "good faith" belief in deciding whether the parent's actions were reasonable. (*In re Jack H.*, *supra*, 106 Cal.App.3d at pp. 264-265.) Here, the court could reasonably find that Father did not intend to abandon his child; that his lack of contact was not due to neglect or disinterest, but was instead motivated by his concern about the pressure his child faced at home and other factors that do not support an abandonment finding. (*In re Aubrey T.*, *supra*, 48 Cal.App.5th at p. 329.)

*The HSA Report*

Mother contends the trial court "ignored" the HSA report where a social worker described J.D.'s wishes and concluded that the child should "be freed to be adopted" by her stepfather. But the court did not ignore this report. It found the HSA "report adequately reports the child's wishes."

The trial court was not bound by the agency's recommendation. (*In re Armando L.* (2016) 1 Cal.App.5th 606, 615; *In re Miguel E.* (2004) 120 Cal.App.4th 521, 548.) Moreover, this report was premature and incomplete. The HSA made its

8

recommendation without interviewing Father.  It made its recommendation based only on "the interviews conducted with" Mother and J.D.  It did not have the benefit of Father's testimony at the hearing.  The court could consider the unfairness of HSA reaching such a conclusion without considering the facts presented by Father.

Mother notes that the report indicates that J.D. wanted to be adopted by her stepfather.  But the "issue herein was whether there was an abandonment of the child.  The child's wishes . . . were immaterial upon that issue." (*In re Welch* (1951) 108 Cal.App.2d 466, 474.)  Those wishes do not come into play until after the court finds the parent intended to abandon the child. (*In re Baby Boy S.* (1987) 194 Cal.App.3d 925, 933; *In re Cattalini* (1946) 72 Cal.App.2d 662, 671.)

We have reviewed Mother's remaining contentions and we conclude she has not shown grounds for reversal.

DISPOSITION

The judgment is affirmed.  Costs on appeal are awarded in favor of the respondent.

NOT TO BE PUBLISHED.

GILBERT, P. J.

We concur:


YEGAN, J.          BALTODANO, J.

Tari L. Cody, Judge

Superior Court County of Ventura

_____

Norris Legal Group, Gina S. Berry and Cameron T. Norris for Plaintiff and Appellant.

Leslie A. Barry, under appointment by the Court of Appeal, for Defendant and Respondent.